## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Hon. Marianne O. Battani |
| IN RE: WIRE HARNESSES IN RE: OCCUPANT SAFETY SYSTEMS | Case No. 2:14-cv-14451-MOB-MKM Case No. 2:14-cv-00107-MOB-MKM Case No. 2:15-cv-12050-MOB-MKM Case No. 2:12-cv-00607-MOB-MKM |
| THIS DOCUMENT RELATES TO TRUCK AND EQUIPMENT DEALER CASES | |

### TRUCK AND EQUIPMENT DEALER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENTS WITH CERTAIN DEFENDANTS, FOR PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASSES, AND TO AUTHORIZE DISSEMINATION OF CLASS NOTICE

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Truck and Equipment Dealer Plaintiffs ("TED Plaintiffs") respectfully move the Court for an order preliminarily approving proposed settlements totaling $2,807,500 with Defendants DENSO Corporation and DENSO International America, Inc. ("DENSO"); Defendants Tokai Rika Co., Ltd. and TRAM, Inc., d/b/a Tokai Rika U.S.A. Inc. ("Tokai Rika"); Defendants LEONI Wiring Systems, Inc. and Leonische Holding Inc. ("LEONI"); Defendants Furukawa Electric Co., Ltd. and American Furukawa, Inc. ("Furukawa"); Defendants Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG, and Autoliv Japan Ltd. ("Autoliv"); and Defendants ZF TRW Automotive Holdings Corp. (formerly known as "TRW Automotive Holdings Corp.") and TRW Deutschland Holding GmbH ("TRW") (collectively, "Settling Defendants"), provisionally certifying the proposed Settlement Classes in the above-entitled actions, and approving the dissemination of class notice and to conduct a hearing for final approval of the Settlements with Settling Defendants.

In support of this Motion, TED Plaintiffs rely upon and incorporate by reference herein the facts and legal arguments set forth in the accompanying Memorandum of Law and the Declaration of William Wickersham.

The TED Plaintiffs and Settling Defendants do not request a hearing for this motion.  The Setting Defendants do not oppose this motion and consent to the entry of the Proposed Order.

Dated:  August 22, 2016

/s/ J. Manly Parks
Wayne A. Mack (PA Bar #46654)
J. Manly Parks (PA Bar #74647)
Andrew R. Sperl (PA Bar #311467)
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA  19103
Phone: (215) 979-1000
Fax: (215) 979-1020
wamack@duanemorris.com
jmparks@duanemorris.com

*Counsel for Truck and Equipment Dealer Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Hon. Marianne O. Battani |
| IN RE:  WIRE HARNESSES IN RE:  OCCUPANT SAFETY SYSTEMS | Case No. 2:14-cv-14451-MOB-MKM Case No. 2:14-cv-00107-MOB-MKM Case No. 2:15-cv-12050-MOB-MKM Case No. 2:12-cv-00607-MOB-MKM |
| THIS DOCUMENT RELATES TO TRUCK AND EQUIPMENT DEALER CASES | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUCK AND EQUIPMENT DEALER**
**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF**
**PROPOSED SETTLEMENTS WITH CERTAIN DEFENDANTS,**
**FOR PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASSES, AND**
**TO AUTHORIZE DISSEMINATION OF CLASS NOTICE**

## PRELIMINARY STATEMENT

Truck and Equipment Dealer Plaintiffs ("TED Plaintiffs") move for preliminary approval of proposed settlements totaling $2,807,500 with Defendants DENSO Corporation and DENSO International America, Inc. ("DENSO"); Defendants Tokai Rika Co., Ltd. and TRAM, Inc., d/b/a Tokai Rika U.S.A. Inc. ("Tokai Rika"); Defendants LEONI Wiring Systems, Inc. and Leonische Holding Inc. ("LEONI"); Defendants Furukawa Electric Co., Ltd. and American Furukawa, Inc. ("Furukawa"); Defendants Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG, and Autoliv Japan Ltd. ("Autoliv"); and Defendants ZF TRW Automotive Holdings Corp. (formerly known as "TRW Automotive Holdings Corp.") and TRW Deutschland Holding GmbH ("TRW") (collectively, "Settling Defendants").

## STATEMENT OF ISSUES PRESENTED

1. Whether TED Plaintiffs' settlement with DENSO, embodied in the Settlement Agreement entered into on July 25, 2016 (" DENSO Settlement Agreement"), and attached hereto as Exhibit 1, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

2. Whether the Court should stay the proceedings by TED Plaintiffs against DENSO in accordance with the terms of the DENSO Settlement Agreement?

   **Suggested Answer:   Yes.**

3. Whether TED Plaintiffs' settlement with Tokai Rika, embodied in the Settlement Agreement entered into on July 12, 2016 ("Tokai Rika Settlement Agreement"), and attached hereto as Exhibit 2, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

4. Whether the Court should stay the proceedings by TED Plaintiffs against Tokai Rika in accordance with the terms of the Tokai Rika Settlement Agreement?

   **Suggested Answer:   Yes.**

DM1\7152026.3

5.  Whether TED Plaintiffs' settlement with LEONI, embodied in the Settlement Agreement entered into on July 27, 2016 ("LEONI Settlement Agreement"), and attached hereto as Exhibit 3, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

6.  Whether the Court should stay the proceedings by TED Plaintiffs against LEONI in accordance with the terms of the LEONI Settlement Agreement?

   **Suggested Answer:   Yes.**

7.  Whether TED Plaintiffs' settlement with Furukawa, embodied in the Settlement Agreement entered into on August 18, 2016 ("Furukawa Settlement Agreement") and attached hereto as Exhibit 4, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

8.  Whether the Court should stay the proceedings by TED Plaintiffs against Furukawa in accordance with the terms of the Furukawa Settlement Agreement?

   **Suggested Answer:   Yes.**

9.  Whether TED Plaintiffs' settlement with Autoliv, embodied in the Settlement Agreement entered into on April 11, 2016 ("Autoliv Settlement Agreement"), and attached hereto as Exhibit 5, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

10. Whether the Court should stay the proceedings by TED Plaintiffs against Autoliv in accordance with the terms of the Autoliv Settlement Agreement?

   **Suggested Answer:   Yes.**

11. Whether TED Plaintiffs' settlement with TRW, embodied in the Settlement Agreement entered into on July 27, 2016 ("TRW Settlement Agreement"), and attached hereto as Exhibit 6, is fair, reasonable, and adequate and should be preliminarily approved?

   **Suggested Answer:   Yes.**

12. Whether the Court should stay the proceedings by TED Plaintiffs against TRW in accordance with the terms of the TRW Settlement Agreement?

13. Whether the Court should provisionally certify the Wire Harnesses Settlement Classes as they are defined herein under Federal Rules of Civil Procedure 23(a) and (b)(3)?

   **Suggested Answer:   Yes.**

DM1\7152026.3

14. Whether the Court should provisionally certify the Occupant Safety Systems Settlement Class as they are defined herein under Federal Rules of Civil Procedure 23(a) and (b)(3)?

>    **Suggested Answer:   Yes.**

15. Whether the Court should authorize Settlement Class Counsel to provide notice of the DENSO Settlement Agreement, Tokai Rika Settlement Agreement, LEONI Settlement Agreement, Furukawa Settlement Agreement, Autoliv Settlement Agreement, and TRW Settlement Agreement to Members of the respective Settlement Classes (as they are defined in the respective Settlement Agreements)?

>    **Suggested Answer:   Yes.**

16. Whether the Court should appoint Lead Class Counsel for TED Plaintiffs as Wire Harness and Occupant Safety System Settlement Class Counsel for the respective Settlements?

>    **Suggested Answer:   Yes.**

DM1\7152026.3

## STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES

- Fed. R. Civ. P. 23

- *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)

- *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)

- *Cason-Merenda v. VHS of Mich., Inc.*, 2013 U.S. Dist. LEXIS 131006 (E.D. Mich. Sept. 13,

- 2013)

- *Griffin v. Flagstar Bancorp, Inc.*, 2013 U.S. Dist. LEXIS 173702 (E.D. Mich. Dec. 12, 2013)

- *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)

- *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003)

- *In re Corrugated Container Antitrust Litig.*, 1981 WL 2093 (S.D. Tex. Jan. 27, 1981)

- *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007)

- *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)

- *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 17255 (E.D. Mich. Feb. 22, 2011)

- *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)

- *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013)

- *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583 (E.D. Mich. 2006)

- *Sheick v. Auto Component Carrier LCC*, 2010 U.S. Dist. LEXIS 110411 (E.D. Mich. Oct. 18, 2010)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ ii

STATEMENT OF ISSUES PRESENTED........................................................ ii

STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES .................. v

INTRODUCTION ............................................................................................1

THE BASIC TERMS AND BACKGROUND OF THE SETTLEMENT AGREEMENTS .........6

ARGUMENT ..................................................................................................26

I.      Preliminary Approval Should be Granted Because the Proposed Settlements Fall Well Within the Range of Possible Approval. ........................... 26

     A.      The Settlement Agreements Achieve an Excellent Result for the Proposed Settlement Classes, Particularly Given the Expense, Duration, and Uncertainty of Continued Litigation........................................................ 29

     B.      The Settlement Agreements Are the Result of Thorough Arm's-Length Negotiations Conducted by Highly Experienced Counsel........................ 33

II.      The Proposed Settlement Classes Should be Provisionally Certified Pursuant to Rule 23. ........................................................................ 35

     A.      The Proposed Settlement Classes Meet the Requirements of Rule 23(a). 36

         i.      The Proposed Settlement Classes are so Numerous That it is Impracticable to Bring All Class Members Before the Court. ......................................................................37

         ii.      TEDP Class Representatives and the Proposed Settlement Classes Share Common Legal and Factual Questions..................37

         iii.      TEDP Class Representatives' Claims are Typical of the Claims of the Members of the Proposed Settlement Classes........39

         iv.      Proposed Settlement Class Counsel and TEDP Class Representatives Will Fairly and Adequately Protect the Interests of the Proposed Settlement Classes...............................40

     B.      The Proposed Settlement Classes Meet the Requirements of Rule 23(b)(3). ..................................................................... 41

         i.      Common Questions of Law and Fact Predominate. ......................42

ii.    A Class Action is the Superior Method to Adjudicate These Claims. ..........................................................................44

C.    The Proposed Settlement Classes Meet the Requirements of Rule 23(b)(2). ................................................................ 45

III.    The Court Should Approve the Form and Manner of Notice to the Members of the TED Settlement Classes. ........................................... 46

A.    Notice Standards and Requirements. ..................................... 46

B.    The Proposed Manner of Notice Satisfies the Requirements of Fed. R. Civ. P. 23(c)(2)(B) and (e)(1). ....................................... 47

C.    The Proposed Form of Notice Satisfies the Requirements of Fed. R. Civ. P. 23(c)(2)(B) and (e)(1). ....................................... 49

D.    The Proposed Notices Provide Class Members With Sufficient Information About the Details of the Settlements. ................... 50

IV.    The Court Should Enter the Proposed Order, Which Schedules the Final Approval Hearing and Establishes Other Deadlines. ............................ 53

CONCLUSION ................................................................................54

DM1\7152026.3

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) .......................................51

*Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242 (7th Cir. 1992) ....................................................26

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) .........................51

*In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609 (D. Kan. 1995) ...............................38

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ...........................................................37, 39

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ......................................................41, 43, 45

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ...............................36, 42

*In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652 (D.D.C. 1979) ....................................................33

*Berland v. Mack*, 48 F.R.D. 121 (S.D.N.Y. 1969) ...........................................................................47

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ...................................................................43

*In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222 (E.D. Pa. 2012) .........................................43

*Bobbitt v. Acad. of Reporting*, 2009 WL 2168833 (E.D. Mich. Jul. 21, 2009) ............................27

*Bowers v. Windstream Ky. East, LLC*, Civil Action No. 3:09-CV-440-H, 2013
   U.S. Dist. LEXIS 157242 (W.D. Ky. Nov. 1, 2013) ................................................................34

*Brotherton v. Cleveland*, 141 F.Supp.2d 907 (S.D. Ohio 2001) ....................................................52

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. ..........................................................................45

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) .............................*Passim*

*Carlough v. Amchem Prods.*, 158 F.R.D. 314 (E.D. Pa. 1993) .......................................................47

*Cason-Merenda v. VHS of Mich., Inc.*, 2013 U.S. Dist. LEXIS 131006 (E.D.
   Mich. Sept. 13, 2013) ...............................................................................................*Passim*

*In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822 (W.D. Pa. 1995) .............................................30

*Clark Equip. Co. v Int'l Union of Allied Industrial Workers of Am.*, 803 F.2d 878
   (6th Cir. 1986) .............................................................................................................27

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .......................................................................42

*Connectivity Systems Inc. v. National City Bank*, 2011 WL 292008 (S.D. Ohio Jan. 26, 2011) ...................................................................................................52

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 2008) ...........................................................51

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) .........................................................................................................43

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................40

*Date v. Sony Elecs., Inc.*, Case No. 07-15474, 2013 U.S. Dist. LEXIS 108095 (E.D. Mich. July 31, 2013) ....................................................................................37

*In re Delphi Corp. Sec. Derivatives & ERISA Litig.*, 248 F.R.D. 483 (E.D. Mich. 2008) ............................................................................................................35, 50

*In re Diet Drugs Prod. Liab. Litig.*, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) .......53

*Dillworth v. Case Farms Processing, Inc.*, No. 5:08-cv-1694, 2010 U.S. Dist. LEXIS 20446 (N.D. Ohio Mar. 8, 2010) ............................................................44

*In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534 (N.D. Ga. 1992) ........46-47

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006) ..............................38

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).......................................................47

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240 (S.D. Ohio 1991) .........................................................................................................52

*In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007) ..................................................................................30

*Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008)..............................................................46

*In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007)............................*Passim*

*Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005)...........................................37

*Griffin v. Flagstar Bancorp, Inc.*, Case No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702 (E.D. Mich. Dec. 12, 2013) ......................................26, 34, 37, 39

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975)................................46

*Hainey v. Parrott*, No. 1:02–cv–733, 2007 WL 3308027 (S.D. Ohio Nov. 6, 2007)...................52

*Hyland v. Homeservices of Am., Inc.*, Case No. 3:05-CV-612-R, 2008 U.S. Dist. LEXIS 90892 (W.D. Ky. Nov. 6, 2008) ...............................................................36

*Int'l Union, UAW v. Ford Motor Co.*, Case Nos. 05-74730, 06-10331, 2006 U.S.
  Dist. LEXIS 70471 (E.D. Mich. July 13, 2006) ............................................................27, 39

*IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583 (E.D. Mich. 2006)............................................26

*Larson v. Sprint Nextel Corp.*, No. 07-5325, 2009 WL 1228443 (D.N.J. April 30,
  2009) ............................................................................................................................48

*Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818 (E.D. Mich. 2008)....................................34

*Levva v. Medline Indus, Inc.*, 716 F.3d 510 (9th Cir. 2013) ............................................................42

*Liberte Capital Group v. Capwill*, 2007 WL 2492461 (N.D. Ohio Aug. 29, 2007)....................52

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)................................ 31-32

*Marcus v. Dep't of Revenue*, 206 F.R.D. 509 (D. Kan. 2002)......................................................41

*Miller v. Univ. of Cincinnati*, 241 F.R.D. 285 (S.D. Ohio 2006) ................................................36

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............................................47

*In re Packaged Ice Antitrust Litig.*, Case No. 08- MD-01952, 2010 U.S. Dist.
  LEXIS 77645 (E.D. Mich. Aug. 2, 2010)................................................................32

*In re Packaged Ice Antitrust Litig.*, Case No. 08-MD-01952, 2011 U.S. Dist.
  LEXIS 17255 (E.D. Mich. Feb. 22, 2011).......................................................*Passim*

*In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 U.S. Dist.
  LEXIS 150427 (E.D. Mich. Dec. 13, 2011) ............................................................29

*In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 U.S. Dist. LEXIS
  140235 (E.D. Mich. Sept. 2, 2010)........................................................................35

*Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483 (D.C. Cir. 1992)......................................46

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................................46

*In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473 (E.D. Mich.
  Jan. 20, 2015)........................................................................................................52

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697 (M.D.
  Pa. 2008) ................................................................................................................32

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450 (D.N.J.
  1997) ......................................................................................................................49

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362 (S.D. N.Y. 1996)........................47

x

*Rankin v. Rots*, No. 02-cv-71045, 2006 U.S. Dist. LEXIS 45706 (E.D. Mich. June 28, 2006) ..................................................................................................27

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) ...................................43

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ...............................31

*In re Revco Sec. Litig.*, 1992 WL 118800 (N.D. Ohio May 6, 1992) ...........................52

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) ...................................31

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ............................ 41-44

*Sheick v. Auto Component Carrier LCC*, Case No. 2:09-cv-14429, 2010 U.S. Dist. LEXIS 110411 (E.D. Mich. Oct. 18, 2010) ....................................................33

*In re Skelaxin Antitrust Litig.*, No. 12–cv–83, 2014 WL 2946459 (E.D. Tenn. June 30, 2014) ..................................................................................................52

*In re Southeastern Milk Antitrust Litig.*, Master File No. 2:09-MD-1000, 2010 U.S. Dist. LEXIS 94223 (E.D. Tenn. Sept. 7, 2010) ....................................36

*In re Sterling Foster & Company, Inc. Sec. Litig.*, 238 F. Supp. 2d 480 (E.D.N.Y. 2002) ................................................................................................53

*Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000).....................................................39

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, Case No. 1:01-CV-9000, 2001 U.S. Dist. LEXIS 26714 (E.D. Ohio Oct. 19, 2001)..................28

*Thacker v. Chesapeake Appalachia, L.L.C.*, 259 F.R.D. 262 (E.D. Ky. 2009) ............33

*In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004) ................................................................................................44

*In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980).....................................33

*In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008) ..................................43

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .............43

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ...................................43

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .............................................35

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)..........................31

*Weigner v. The City of New York*, 852 F.2d 646 (2d Cir. 1988)...................................47

DM1\7152026.3

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838
(6th Cir. 2013) ....................................................................................... 36-37, 41, 44

**State Cases**

*In re Air Cargo Shipping Serv. Litig.*, No. 06-md-1775 (JG) (VVP), 2011 WL
2909162 (E.D.N.Y. Jul. 15, 2011) ........................................................................ 53

**Regulatory Cases**

*In re Washington Public Power Supply System Sec. Litig.*, [1989 Transfer Binder]
Fed. Sec. L. Rep. (CCH) ¶94,326, 1988 WL 158947 (W.D. Wash. July 28,
1988) ...................................................................................................................... 51

**Federal Statutes**

Antitrust Criminal Penalty Enforcement Reform Act ("ACPERA"), Pub. L. No.
108-237, § 213(a)-(b), 118 Stat. 661, 666-69 (June 22, 2004), *as amended by*
Pub. L. No. 111-190, 124 Stat. 1275 (June 9, 2010) .......................................... 30

Sherman Act, 15 U.S.C. § 1 ................................................................................ 2, 4, 8, 32

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... *Passim*

**Non-Periodical Publications**

6A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 1522, at 225-26 (2d ed. 1990) ........................................................ 26

4 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:10 at
278 (4th ed. 2005) .............................................................................................. *Passim*

Manual for Complex Litigation (Fourth) (2004) ...................................... *Passim*

DM1\7152026.3

Truck and Equipment Dealer Plaintiffs ("TED Plaintiffs"), on behalf of themselves and all others similarly situated, by and through undersigned counsel, respectfully submit this memorandum in support of their motion seeking preliminary approval of settlements with DENSO Corporation and DENSO International America, Inc. ("DENSO" or the "DENSO Defendants"); Tokai Rika Co., Ltd. and TRAM, Inc., d/b/a Tokai Rika U.S.A. Inc. ("Tokai Rika" or the "Tokai Rika Defendants"); LEONI Wiring Systems, Inc. and Leonische Holding Inc. ("LEONI" or the "LEONI Defendants"); Furukawa Electric Co., Ltd. and American Furukawa, Inc. ("Furukawa" or the "Furukawa Defendants"); Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG, and Autoliv Japan Ltd. ("Autoliv" or the "Autoliv Defendants"); and ZF TRW Automotive Holdings Corp. (formerly known as "TRW Automotive Holdings Corp.") and TRW Deutschland Holding GmbH ("TRW" or the "TRW Defendants") (collectively, the "Settling Defendants"), provisional certification of the proposed Settlement Classes, and authorization to disseminate class notice.

## **INTRODUCTION**

This multidistrict litigation arises from alleged conspiracies to fix the prices of certain automotive parts. Vehicle Wire Harness Systems and Occupant Safety Restraint Systems are among the automotive parts at issue in these coordinated proceedings, *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 ("MDL Proceeding"). For the purpose of the proposed settlements, the following definitions shall apply:

"**Trucks and/or Equipment**" means any heavy-duty (Class 8) trucks, light and medium-duty (Class 3, 4, 5, 6, & 7) trucks, buses, commercial vehicles (excluding automobiles, vans, sport utility vehicles, crossovers or pickup trucks, and/or similar motor vehicles sold by

automobile dealerships), all-terrain vehicles, construction equipment, mining equipment,

agricultural equipment, railway vehicles, materials handling vehicles, and other similar vehicles.[1]

**"Truck and/or Equipment Dealership"** means any person or entity who has purchased

Trucks and/or Equipment for resale or lease.

"**Vehicle Wire Harness Systems**" ("VWHS") means any part or subcomponent included

within the definition set forth in Paragraph 3 of TED Plaintiffs' First Amended Class Action

Complaint, Case No. 2:14-cv-14451 (May 29, 2015) [Doc. 64] ("VWHS Complaint"), whether

sold separately, in combination, or as part of a module, assembly, or system.

"**OSS**" means any part or subcomponent included within the definition set forth in

Paragraph 2 of the Class Action Complaint, Case No. 2:15-cv-12050 (June 5, 2015) [Doc. 1]

("OSS Complaint"), whether sold separately, in combination, or as part of a module, assembly,

or system.

The actions in the MDL Proceeding arise from alleged conspiracies by and among the

motor vehicle industry's largest manufacturers, marketers, and sellers of vehicle parts to

allegedly fix prices, rig bids, and allocate the market and customers in the United States for the

sale of vehicle parts, including VWHS and OSS.

TED Plaintiffs were the first and have been the only plaintiffs to file class action

complaints involving VWHS and OSS (or any other vehicle parts) on behalf of Truck and

Equipment Dealerships.  The VWHS Complaint and OSS Complaint assert claims for relief

under the Sherman Act, 15 U.S.C. § 1, and various State antitrust, unfair competition, unjust

enrichment, and consumer protection laws.  Counsel for TED Plaintiffs have been appointed

---

[1]  Although the settlement class definitions vary among the settlement agreements that are the
subject of the instant Motion, the definition used here is sufficiently broad to encompass all of
the settlement class definition variations.

DM1\7152026.3

Interim Class Counsel for the putative class of Truck and Equipment Dealerships in *In Re: Bearings*, No. 2:12-cv-00500 [Doc. 171], and pursuant to the Case Management Order entered in *In Re: Automotive Parts Antitrust Litigation* [Doc. 271], should be considered Interim Class Counsel for the similar putative classes in these cases.  From the inception of these cases, undersigned counsel have represented the interests of the classes of Truck and Equipment Dealerships, including overseeing and directing the prosecution and settlement of the claims brought against the Settling Defendants.  These proposed settlements are a result of those efforts.

TED Plaintiffs, and the classes of Truck and Equipment Dealerships they represent, purchased new Trucks and Equipment in the United States that included one or more VWHS and/or OSS as a component part, or indirectly purchased one or more VWHS and/or OSS as a replacement part, which were manufactured or sold by the Settling Defendants or any other Defendant in these cases, or any of their current or former subsidiaries, affiliates, or alleged co-conspirators.

TED Plaintiffs allege that, in furtherance of the alleged conspiracy or conspiracies, Defendants agreed, during meetings and conversations, to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the supply of VWHS and OSS and then sold those products at supracompetitive prices to Truck and Equipment OEMs, which in turn passed along the overcharges to Truck and Equipment Dealerships in the United States and elsewhere.  *See*, *e.g.*, OSS Complaint at ¶ 174.

The United States Department of Justice ("DOJ") has been investigating collusion by automotive parts manufacturers since at least February 2010, and the Federal Bureau of Investigation ("FBI") has participated in raids carried out in some of the offices of Settling Defendants and executed search warrants related to unfair competition, price-fixing, and bid

DM1\7152026.3

rigging of certain automotive parts.  Settling defendants pled guilty to violations of the Sherman

Act, 15 U.S.C. § 1 as follows:

- DENSO Corporation agreed to plead guilty and pay a $78 million criminal fine for engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain prices of, certain electronic control units and a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels, each sold to an automobile manufacturer in the United States and elsewhere, in violation of the Sherman Act, 15 U.S.C. § 1;

- Furukawa agreed to plead guilty and pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of VWHS;

- Autoliv agreed to plead guilty and pay a $14.5 million criminal fine for conspiring and agreeing to rig bids for, and to fix, stabilize, and maintain the price of OSS, including seatbelts, steering wheels, and airbags; and

- TRW agreed to plead guilty and pay $5.1 million in criminal fines for fixing the prices of seatbelts, steering wheels and airbags.

The settlements between the TED Plaintiffs and Settling Defendants are meaningful and

substantial and will result in payments of $2,807,500 for the benefit of the respective settlement

classes, a significant achievement in this litigation.  The monetary recovery from Settling

Defendants, alone, is substantial.  Moreover, the settlements provide additional value to the TED

Plaintiffs because they require Settling Defendants to provide cooperation in the form of, *inter*

*alia*, attorney proffers, interviews with and depositions of witnesses, and the production of

certain documents (including transactional data) related to the claims asserted in these cases as

well as in other cases brought by TED Plaintiffs in the MDL Proceeding.  Such information is

especially valuable at this stage in these cases, as it will materially assist TED Plaintiffs in their

efforts to collect evidence and make their cases against the remaining Defendants.  Settling

Defendants' cooperation will greatly enhance TED Plaintiffs' ability to prosecute their claims

against the remaining non-settling Defendants.

Settling Defendants' sales will remain in these cases for purposes of computing the treble damages claims against the non-settling Defendants and shall be part of any joint and several liability claims against other current or future defendants. *See* DENSO Settlement Agreement ¶ 56; LEONI Settlement Agreement ¶ 47; Tokai Rika Settlement Agreement ¶ 46; Furukawa Settlement Agreement ¶ 64; Autoliv Settlement Agreement ¶ 49; and TRW Settlement Agreement at ¶ 47. The TED Plaintiffs and the proposed Settlement Classes retain their ability to recover from the remaining non-settling Defendants the entire damages caused by the alleged conspiracies, even those attributable to Settling Defendants, less only the amounts paid by Settling Defendants in settlement.

TED Plaintiffs and their counsel believe, for all the reasons set forth, that the proposed settlements with Settling Defendants are in the best interest of the proposed members of the Settlement Classes and merit the Court's preliminary approval. TED Plaintiffs therefore request the entry of an Order:

1. Preliminarily approving the DENSO Settlement Agreement, LEONI Settlement Agreement, Tokai Rika Settlement Agreement, Furukawa Settlement Agreement, Autoliv Settlement Agreement, and TRW Settlement Agreement ("Settling Defendants' Settlement Agreements");

2. Provisionally certifying the proposed Settlement Classes;

3. Staying the proceedings against Settling Defendants in accordance with the terms of the respective Settlement Agreements;

4. Authorizing dissemination of class notice for the Settling Defendants' Settlement Agreements; and

5. Appointing undersigned counsel for TED Plaintiffs as Settlement Class Counsel for the settlements.

## THE BASIC TERMS AND BACKGROUND OF THE SETTLEMENT AGREEMENTS

The Settling Defendants' Settlement Agreements are the result of arm's length and good faith negotiations.  Counsel for TED Plaintiffs and for the Settling Defendants participated in fact-gathering sessions and informational meetings, as well as extended negotiations, that took place through telephone calls, in-person meetings, and other communications.

**VWHS Settlement Classes:**  The Settling Defendants' Settlement Agreements define the VWHS Settlement Class, which includes TED Plaintiffs, in nearly identical ways, as follows:

> All Truck & Equipment Dealerships that, from January 1, 1999, through the Execution Date, purchased a new Vehicle in the United States that included one or more Vehicle Wire Harness Systems as a component part, or indirectly purchased one or more Vehicle Wire Harness Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary or affiliate of a Defendant, or any co-conspirator of a Defendant.

(DENSO Settlement Agreement ¶ 9);

> all present or former Truck and Equipment dealers that, during the Class Period (a) purchased Vehicle Wire Harness Systems manufactured or sold by a Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator of a Defendant; or (b) purchased Trucks and/or Equipment containing Vehicle Wire Harness Systems manufactured or sold by a Defendant or any current or former subsidiary or affiliate thereof, or any coconspirator of a Defendant.

(Furukawa Settlement Agreement ¶ 11);

> All present or former dealers of heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6 & 7) trucks, buses, commercial vehicles (excluding automobiles, light trucks, vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers), construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles that during the Class Period, (a) purchased Vehicle Wire Harness Systems

> manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any coconspirator, or (b) purchased Trucks or Equipment containing Vehicle Wire Harness Systems manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(LEONI Settlement Agreement ¶ 12); and

> All dealers of heavy-duty (Class 8) trucks, medium-duty (Class 4, 5, 6, & 7) trucks, buses, commercial vehicles (excluding automobiles, light trucks, vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers), construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles ("Trucks and/or Equipment") that, during the time period from January 1, 1999 through the Execution Date, (a) purchased Vehicle Wire Harness Systems manufactured by the Defendants, any co-conspirator, or any current or former subsidiary or affiliate thereof, or (b) purchased Trucks and/or Equipment containing Vehicle Wire Harness Systems manufactured by the Defendants or co-conspirator, or any current or former subsidiary of affiliate thereof.

(Tokai Rika Settlement Agreement ¶ 11.).

**OSS Settlement Class:** The respective settlement agreements define the OSS Settlement

Class, which includes TED Plaintiffs, in nearly identical ways, as follows:

> All present or former dealers of Trucks and/or Equipment that during the Class Period (which shall be January 1, 2003 through December 31, 2015) and in the United States, (a) indirectly purchased Occupant Safety Restraint Systems manufactured by the Defendants, any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased  Trucks or Equipment containing Occupant Safety Restraint Systems manufactured by the Defendants, any current or former subsidiary or affiliate thereof or any co-conspirator.

(Autoliv Settlement Agreement ¶ 9);

> All present or former dealers of Trucks and/or Equipment that during the Class Period (which shall be January 1, 2003 through the date of execution of this agreement) and in the United States, (a) indirectly purchased Occupant Safety Restraint Systems manufactured or sold by the Defendants, any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased Trucks or Equipment containing Occupant Safety

> Restraint Systems manufactured or sold by the Defendants, any current or former subsidiary or affiliate thereof or any co-conspirator.

(TRW Settlement Agreement ¶ 9.)

**Settlement Amount:**  Furukawa agreed to pay $1,600,000.00 into an escrow account within thirty (30) days following the later of the date (a) the Court enters an order preliminarily approving this Settlement or (b) Furukawa being provided with the account number, account name, and wiring transfer information for the escrow account.  Furukawa Settlement Agreement ¶ 28.  DENSO agreed to pay $625,000.00 into a segregated escrow account within thirty (30) days following the later of (i) the date the Court grants Preliminary Approval or (ii) the DENSO Defendants being provided with the account number, account name, and wiring information for the escrow account.  DENSO Settlement Agreement ¶¶ 12, 26.  LEONI agreed to pay $150,000.00 into a segregated escrow account within thirty (30) days following entry of an order preliminarily approving this Agreement.  LEONI Settlement Agreement ¶ 24.  Tokai Rika executed its escrow agreement on August 8, 2016 and will pay $72,500.00 into a segregated escrow account.  Toka Rika Settlement Agreement ¶ 24.  TRW agreed to pay $165,000 into an escrow account within ten (10) business days after being provided with the W-9, account number, account name and wiring instructions of the Escrow Account.  TRW Settlement Agreement ¶ 23.  Autoliv paid $195,000 into an escrow account on or around June 6, 2016.  Autoliv Settlement Agreement ¶ 23.

**Injunctive Relief:**  DENSO has agreed to be enjoined for a period of two years beginning on the date of entry of the final order and judgment in this case, from engaging in any price-fixing, bid-rigging, or market allocation in violation of Section 1 of the Sherman Act.  *Id.* ¶ 21(g).

8

**Cooperation:**  Settling Defendants have agreed to provide cooperation to the proposed Settlement Classes that will significantly aid in the prosecution of antitrust claims against the remaining Defendants.  Additionally, DENSO has agreed to provide extensive cooperation to the proposed Settlement Classes that will significantly aid in the prosecution of antitrust claims relating to any motor vehicle part, module, or assembly sold by Settling Defendants for incorporation into Trucks and Equipment for which TED Plaintiffs are pursuing claims in the MDL Proceeding, not just VWHS.  A general summary of Settling Defendants' cooperation obligations is provided below.  The full extent of this cooperation is set forth in more detail in the respective Settlement Agreements.

Furukawa's obligation to cooperate includes, among many other things, the duty to provide:

40.    <u>Documents</u>.  Furukawa will use its best efforts, to the extent it is reasonable, to substantially complete production of non-privileged Documents in its possession, custody, or control that are responsive to TED Plaintiffs' current requests, as limited by agreement with Furukawa, and found in the files of agreed-upon custodians, no later than sixty (60) calendar days after the Court's entry of an order preliminarily approving this Agreement, including, but not limited to:

(a)    All Documents that Furukawa produced to the DoJ in connection with its investigation of price-fixing, bid-rigging, and market allocation of Wire Harness Systems, including all English translations, to the extent they exist;

(b)    All statements submitted to the JFTC by or on behalf of Furukawa employees that relate to the sale of Vehicle Wire Harness Systems for light and commercial trucks and equipment;

(c)    Documents concerning Furukawa's determination of its prices for Vehicle Wire Harness Systems;

(d)    Documents that relate to or concern the allegations in the Complaint or that relate to or concern an actual or potential communication, meeting, or agreement regarding Vehicle Wire

9

Harness Systems, by an employee or representative of Furukawa with any employee or representative of another manufacturer or seller of Vehicle Wire Harness Systems;

(e)     Documents, if any, concerning Furukawa's determinations of its prices for products comprising Vehicle Wire Harness Systems that it sells in the United States or for installation in vehicles that are known to be exported to the United States, including pricing policies, formulas and guidelines, and Documents concerning the relationship between prices charged or submitted to different OEMs or to the same OEM for different models;

(f)     Documents, if any, concerning Vehicle Wire Harness Systems that were collected and reviewed in connection with Furukawa's internal investigation but were not provided to or seized by Government Entities and that are relevant to the claims and allegations in the Complaint; and

(g)     Documents, if any, showing how employees were trained or instructed to bid and set prices submitted to purchasers or potential purchasers, for products comprising Vehicle Wire Harness Systems, in RFQs, or any other procurement process, including Documents stating the lowest bid or price employees were authorized to submit, how to determine the lowest allowable bid or price, and when and how to increase or decrease a proposed bid or price.

44.     <u>Transactional Data</u>.  Within 90 days of the Execution Date of this Agreement, Furukawa will produce transactional data, to the extent it exists, is reasonably accessible in Furukawa's electronic databases, and has not already been produced, that is responsive to TED Plaintiffs' current requests, as limited by agreement with Furukawa, concerning Furukawa's sales of Vehicle Wire Harness Systems to Original Equipment Manufacturers ("OEMs") or other purchasers of Vehicle Wire Harness Systems from January 1, 2003 to December 31, 2014, including available transactional data, if any, containing the following information: (a) the date for each sale; (b) the final price of each sale; (c) the purchaser to whom each sale was made; (d) the model, model year(s), and brand of vehicle for which each sale was made, as well as the country of sale of said vehicles; (e) the total amount of products comprising Vehicle Wire Harness Systems sold in each sale; (f) the location where each sale was made; (g) the Furukawa entity that made each sale; (g) any ancillary costs associated with each sale such as tooling costs; (h) Furukawa's profits, losses and margins on the products comprising Vehicle Wire Harness

Systems and other reasonably available financial information, *e.g.*, balance sheets and ledger data; (i) Furukawa's costs to produce the products comprising Vehicle Wire Harness Systems; and (j) any other transactional data reasonably agreed to in writing between Furukawa's counsel and Settlement Class Counsel. Furukawa will not be obligated to do any analyses of the data for Settlement Class Counsel, outside of the attorney proffers described in Paragraph 39. Furukawa will provide any translations of the above data by Furukawa that may exist as of the Execution Date of this Agreement. Furthermore, Furukawa shall only be obligated to provide transactional data regarding sales of Vehicle Wire Harness Systems sold to customers in the United States or sold to customers outside the United States for installation in vehicles known to be exported to the United States. Furukawa's counsel will make themselves available for reasonable follow-up telephone conversations regarding the transactional data, and will use reasonable efforts to respond to questions posed by Settlement Class Counsel. Furukawa shall use reasonable efforts to determine its sales of Vehicle Wire Harness Systems sold to customers outside the United States for installation in vehicles exported to the United States.

(Furukawa's Settlement Agreement ¶¶ 38-40, 44.)

DENSO's obligation to cooperate includes, among many other things, the duty to provide:

35. <u>Transactional Data</u>. At the request of Truck & Equipment Dealership Plaintiffs, following Preliminary Approval, and subject to meet and confer with the DENSO Defendants as to any reasonable limitations on this obligation, the DENSO Defendants will use their best efforts to produce on a rolling basis within two hundred seventy (270) days after such request, existing and reasonably accessible transactional data (including English translations thereof, to the extent they exist) related to any part, module, or assembly sold by the DENSO Defendants for incorporation into any Vehicle to the extent Truck & Equipment Dealership Plaintiffs are pursuing claims in the MDL Proceeding against one or more other Defendants with respect to such part, module, or assembly and continue to pursue such claims at the time of production. The DENSO Defendants will use their best efforts to begin production of the foregoing transactional data as soon as reasonably possible after such request and agree to prioritize such productions to the extent practicable. The time period for this production will be from January 1, 1996 to

11

December 31, 2013, but only to the extent such data currently exist and are reasonably accessible.

36. <u>Documents</u>. The DENSO Defendants have already produced tens of thousands of Documents to Truck & Equipment Dealership Plaintiffs. To the extent not already produced, the DENSO Defendants also will produce all Documents that the DENSO Defendants produced to the U.S. Department of Justice in connection with its investigation of price-fixing, bid-rigging, and market allocation of any of the parts, modules, or assemblies at issue in Case No. 2:15-cv-14097 (E.D. Mich.), Case No. 2:15-cv-01007 (E.D. Mich.), Case No. 2:15-cv-14096 (E.D. Mich.), Case No. 2:15-cv-00707 (E.D. Mich.), and Case No. 2:15-cv-01107 (E.D. Mich.) (collectively, the "Radiators, Alternators, and Starters Actions"), including all English translations produced to the DOJ, within one hundred twenty (120) days after Preliminary Approval. The DENSO Defendants will consider in good faith any reasonable further request by Truck & Equipment Dealership Plaintiffs, following Preliminary Approval, to collect, and make available for inspection and copying, additional Documents related to any part, module, or assembly sold by the DENSO Defendants for incorporation into any Vehicle to the extent Truck & Equipment Dealership Plaintiffs are pursuing claims in the MDL Proceeding against one or more other Defendants with respect to such part, module, or assembly and continue to pursue such claims at the time of production, provided the request would not impose an undue burden on the DENSO Defendants.

39. <u>Other Cooperation</u>. Within forty-five (45) days after Preliminary Approval, the DENSO Defendants will provide a list of current or former officers, directors, or employees who were interviewed by any Government Entity, who testified before a grand jury in connection with the DOJ's investigation, or were disclosed to any Government Entity as having knowledge of alleged antitrust violations as to any part, module, or assembly at issue in the Radiators, Starters, and Alternators Actions, given however, that the DENSO Defendants shall not be required to disclose to Truck & Equipment Dealership Plaintiffs or Settlement Class Counsel the specific Government Entities before which each such current or former employee, director, or officer appeared or to which they were disclosed as having knowledge of alleged antitrust violations.

(DENSO Settlement Agreement at ¶¶ 35, 36, 39).

12

Tokai Rika's obligation to cooperate includes, among many other things, the duty to

provide:

32.   In return for the release and discharge provided herein, within ten (10) business days after Preliminary Approval of this Agreement, to the extent not already provided, counsel for Tokai Rika shall provide Settlement Class Counsel with the identity of all current and former employees, directors and officers of Tokai Rika who: (1) were interviewed and/or prosecuted by any Government Entity in connection with alleged price-fixing, bid rigging, market allocation, and customer allocation with respect to Vehicle Wire Harness Systems in the United States or for vehicles that were sold in the United States; and/or (2) appeared before the grand jury in the DOJ's investigation into alleged antitrust violations with respect to Vehicle Wire Harness Systems; and/or (3) were disclosed to the DOJ as having knowledge or information relating to the DOJ's investigation into alleged antitrust violations with respect to Vehicle Wire Harness Systems. Neither Tokai Rika nor Counsel for Tokai Rika shall be required to disclose to Settlement Class Counsel the specific Government Entities to which each such current or former employee, director or officer of Tokai Rika was identified to or appeared before.

33.   To the extent legally permissible and it has not already done so, within forty-five (45) business days of Preliminary Approval of this Agreement, Tokai Rika shall produce to Rush Truck Plaintiffs:

a)   All documents that were created in the ordinary course of business provided to or seized by the DOJ or any of the other Government Entities in connection with an investigation of price-fixing, bid-rigging, market allocation, and customer allocation of Vehicle Wire Harness Systems. This production shall include all English translations provided or seized, but Tokai Rika will not identify which documents may have been provided to any Government Entity or indeed which Government Entities may have or may be investigating Tokai Rika;

b)   Transactional sales and cost data kept in the ordinary course of Tokai Rika's business, to the extent such data exists in Tokai Rika's electronic databases and is reasonably accessible, related to Tokai Rika's bids, price submissions and sales of Vehicle Wire Harness Systems sold directly to purchasers of Vehicle Wire Harness Systems in the United States for the period January 1, 1998 through December 31, 2014. Tokai Rika shall also provide reasonable assistance to Settlement Class Counsel in

13

understanding the transactional sales and cost data produced, including, if appropriate, a reasonable number of communications with Rush Truck Plaintiffs' experts and between technical personnel;

c)     Non-privileged documents that are reasonably accessible that are sufficient to show Tokai Rika's general methodology for determination of its prices and bids for the products comprising the Vehicle Wire Harness Systems that it sells, including pricing policies, formulas and guidelines; and

d)     Non-privileged documents concerning Vehicle Wire Harness Systems, collected and reviewed in connection with Tokai Rika's internal investigation, that are relevant to the allegations in the Complaint, or that have been identified by Tokai Rika as relating to or concerning a communication, meeting, or agreement regarding Vehicle Wire Harness Systems, by any employee, officer or director of Tokai Rika with any employee, officer or director of another manufacturer or seller of Vehicle Wire Harness Systems, but that were not provided to or seized by Government Entities.

e)     With respect to Paragraphs 33(b)-(d) above, the parties acknowledge that responsive documents may not exist, and Tokai Rika has already produced extensive documents responsive to Paragraphs 33(b)-(d).   Tokai Rika will consider in good faith reasonable requests by Settlement Class Counsel for narrow, targeted follow-up.  However, Rush Truck Plaintiffs acknowledge that Tokai Rika contends that it has not sold Vehicle Wire Harness Systems or to U.S. Truck and/or Equipment manufacturers or dealers.

f)     In making any production contemplated by this Agreement, Tokai Rika is entitled to withhold from production any Documents protected from disclosure by the attorney-client privilege, doctrine, or law.  In providing Documents, Tokai Rika is not required to create a privilege log or otherwise provide Rush Truck Plaintiffs with identifying information regarding the Documents withheld. No Document created in the ordinary course of business shall be withheld under claim of privilege if produced or made available to any Government entity.   If any Document protected by the attorney-client privilege, attorney work-product protection or any other privilege is accidentally or inadvertently produced under this Paragraph, upon notice by Tokai Rika of such inadvertent production, the Document shall promptly be destroyed and/or returned to Tokai Rika, and its production shall in no way be construed to have waived any privilege or protection attached to such Document.  This Agreement, together with the Protective

14

Order in each of the Actions, brings any inadvertent production by Tokai Rika within the protections of Federal Rule of Evidence 502(d), and Settlement Class Counsel will not argue that production to any person or entity made at any time suggests otherwise. For the avoidance of doubt, Rush Truck Plaintiffs expressly agree that they will not seek any discovery from Tokai Rika or the Releasees after the Execution Date including but not limited to written discovery, document discovery, or deposition discovery.

(Tokai Rika Settlement Agreement at ¶¶ 32, 33).

LEONI's obligation to cooperate includes, among many other things, the duty to provide:

35.    <u>Attorney Proffers and Witness Interviews.</u> Additionally, LEONI shall use its best efforts to cooperate with Settlement Class Counsel as set forth in Paragraphs 35(a)-(d) below.

(a)    LEONI's counsel will make themselves available in the United States to Settlement Class Counsel for one (1) meeting of one (1) business day to provide an attorney's proffer of facts known to LEONI regarding Documents, witnesses, and any other relevant topics not covered by privilege or other protections available under any applicable statute or United States law relating to the claims at issue in this Action. Thereafter, LEONI's counsel will make themselves available for reasonable follow-up conversations in connection with the attorney's proffer, and will use reasonable efforts to respond to questions posed by Settlement Class Counsel. LEONI further agrees to provide one (1) declaration or affidavit from (1) one person, and make that person available to testify at a Truck and Equipment Dealer Plaintiff trial in the Action.

(b)    In addition to its Cooperation obligations set forth herein, LEONI agrees to produce through affidavit(s) or declaration(s) and/or at an Truck and Equipment Dealer Plaintiff trial in the Action, at Settlement Class Counsel's discretion, representatives qualified to authenticate, establish as business records, or otherwise establish any other necessary foundation for admission into evidence of any documents or transactional data produced or to be produced by LEONI. Settlement Class Counsel agree to use their best efforts to obtain stipulations that would avoid the need to call LEONI witnesses at trial for the purpose of obtaining such evidentiary foundations.

15

         (c)    To the extent that LEONI produces any transactional data in any of the pending Vehicle Wire Harness Systems cases, LEONI shall produce that same transactional data to Truck and Equipment Dealer Plaintiffs at the same time that it produces the transactional data in the cases.

(Leoni Settlement Agreement at ¶¶ 35.)

Autoliv's obligation to cooperate includes, among many other things, the duty to provide:

        32.    Within 120 days of execution of this Agreement, counsel for Autoliv will make themselves available in the United States for up to three (3) meetings of one (1) business day each to provide detailed proffers of the relevant facts known to them relating to TED Plaintiffs' allegations of price-fixing, bid-rigging, and market allocation of Occupant Safety Restraint Systems ("Attorney Proffers"). As part of the Attorney Proffers, Autoliv's counsel will provide TED Plaintiffs with relevant facts known to them regarding Documents, witnesses, meetings, communications, agreements with competitors, events, background information and any other relevant topics, to the extent not covered by privilege or other protections available under any applicable statute or United States law, relating to the claims at issue in this Action, including any information given to the DOJ and transactions for sale of Occupant Safety Restraint Systems inside the United States or that involve sales of Occupant Safety Restraint Systems for installation in vehicles known to be exported to the United States. Autoliv's counsel will make themselves available for reasonable follow-up conversations in connection with the Attorney Proffers, and will use reasonable efforts to respond to questions posed by Settlement Class Counsel. It is understood that Autoliv has no obligation to seek new or additional information or Documents from any of its employees, representatives, or agents with respect to any follow-up conversations; however, Autoliv will in good faith consider requests for new or additional information or Documents, and will produce such information or Documents, if appropriate, in its discretion. TED Plaintiffs and Settlement Class Counsel agree that all Attorney Proffers made by Autoliv's counsel shall be treated as "Highly Confidential," as said designation is described in the Protective Order in this Action (Doc. 77) and that they shall not use the information so received for any purpose other than the prosecution of claims in the Automotive Parts Antitrust Litigation, 12-md-02311, except as otherwise provided in this Settlement Agreement. Notwithstanding any other provision of this Agreement, the parties and their counsel further agree that any Attorney Proffers or other statements made by Autoliv's counsel in connection with or as part of this settlement shall be governed by

16

Federal Rule of Evidence 408. Notwithstanding anything herein, Settlement Class Counsel may use (but shall not cite, introduce an Attorney Proffer into the record, or depose or subpoena any Autoliv counsel related to an Attorney Proffer) information contained in such Attorney Proffers or other statements in the prosecution of its claims in all cases in the *Automotive Parts Antitrust Litigation*, 12-md-02311, and rely on such information to certify that, to the best of Settlement Class Counsel's knowledge, information and belief, such information has evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

33.   Except as set forth therein, Autoliv will (i) produce all Documents that Autoliv produced to the DOJ in connection with its investigation of price-fixing, bid-rigging, and market allocation of Occupant Safety Restraint systems, including all English translations, to the extent they exist, within 120 days of execution of this Agreement; (ii) produce all English translations, to the extent they exist, of the Documents described in Paragraph 33(a)-(f) within 180 days of execution of this Agreement; and (iii) substantially complete the production of the Documents in Autoliv's possession, custody or control, set forth in sub-paragraphs (a)-(f) within 180 days of execution of this Agreement.

(a)   Notwithstanding the deadlines above, Autoliv will produce within 120 days of execution of this Agreement transactional data, to the extent it exists in Autoliv's electronic databases, concerning Autoliv's bids for and sales of Occupant Safety Restraint Systems to Original Equipment Manufacturers ("OEMs") or other purchasers of Occupant Safety Restraint Systems from January 1, 2003 to two years from the Execution of this Agreement, including available transactional data containing any of the following information: (1) the date for each bid, price submission or sale; (2) the price submitted in each bid or price submission; (3) bids and price submissions formulated but not submitted due to agreements or understandings with co-conspirators; (4) the final price of each sale; (5) the purchaser to whom each bid or price submission was submitted and each sale was made; (6) the model, model year(s), and brand of vehicle for which each bid or price submission was submitted and each sale was made, as well as the country of sale of said vehicles; (7) the total amount of products comprising Occupant Safety Restraint Systems sold in each sale; (8) the location where each bid or price submission was submitted and each sale was made; (9) the Autoliv entity that submitted each bid or price submission and made each sale; (10) the sale agreements and contracts for each sale; (11) value engineering and other price adjustments made to the

17

products comprising Occupant Safety Restraint Systems sold in each sale, including through annual price reductions; (12) any ancillary costs associated with each sale such as tooling costs; (13) the identity of any other bids or prices submitted by competitors, including each winning bid; (14) the specifications for each bid or price submission; (15) adjustments made to each bid as it was being formulated; (16) Autoliv's profits, losses and margins on the products comprising Occupant Safety Restraint Systems and other reasonably available financial information, e.g., balance sheets and ledger data; (17) data showing Autoliv's costs to produce the products comprising Occupant Safety Restraint Systems; and (18) any other transactional data reasonably agreed to in writing between Autoliv's counsel and Settlement Class Counsel.  Autoliv will provide any translations of the above Documents that may exist as of the Execution Date of this Agreement and within two years of the Execution Date.   With respect to any electronic transactional data generated within the two years after the Execution Date of this Agreement, Autoliv shall have no on-going obligation to produce such data as it is generated.   However, Autoliv will provide, in response to a written request from Settlement Class Counsel, a single production of electronic transactional data generated during the two years after the Execution Date of this Agreement, as it exists in the normal course of business in Autoliv's electronic databases at the time of the request, within ninety (90) days of the receipt of such request. Autoliv will preserve such transactional data until two years after the Execution Date of this Agreement, as referred to in this Paragraph 33(a).  Except as provided herein, Autoliv will only produce the data that exists as of the Execution Date.  In addition, Autoliv will produce the same categories of transactional data for each sale to an OEM in which Autoliv Japan Ltd. engaged in anticompetitive conduct described in Autoliv's guilty plea to the United States Department of Justice on June 21, 2012.   Autoliv will produce transactional data only from existing electronic transaction databases and will not be required to compile any data from individual invoices, individual personal computers, or transactional Documents, except that, to the extent Autoliv has not recorded or maintained electronic transaction data for any period between January 1, 2003 and two years after the Execution Date, then Autoliv will use reasonable efforts to produce records of those sales transactions not recorded or maintained electronically in the existing electronic sales transaction databases.   Additionally, Autoliv will provide to TED Plaintiffs any later-generated electronic transactional data that is provided to plaintiffs in any other case involving Occupant Safety Restraint Systems claims in the *In Re Automotive Parts Litigation*, Master File No. 12-md-

02311 (E.D. MI). Furthermore, Autoliv shall only be obligated to provide transactional data regarding sales of Occupant Safety Restraint Systems sold to customers in the United States or sold to customers outside the United States for installation in vehicles known to be exported to the United States. Autoliv shall use reasonable efforts to determine its sales of Occupant Safety Restraint Systems sold to customers outside the United States for installation in vehicles exported to the United States. TED Plaintiffs and Settlement Class Counsel agree that all transactional data and any other Documents produced by Autoliv pursuant to this Paragraph 33(a) shall be treated as "Highly Confidential," as said designation is described in the Protective Order in this Action (Doc. 77); and that they shall not use the information so received for any purpose other than the prosecution of the claims in the Automotive Parts Antitrust Litigation, 12-md-02311, except as otherwise provided in this Settlement Agreement.

(b)     Documents that relate to or concern the allegations in the Complaint or that relate to or concern an actual or potential communication, meeting, or agreement regarding Occupant Safety Restraint Systems, by an employee or representative of Autoliv with any employee or representative of another manufacturer or seller of Occupant Safety Restraint Systems.

(c)     To the extent not already provided to TED Plaintiffs, Documents, if any, provided to or seized by Government Entities relating to their investigation into alleged competition violations with respect to Occupant Safety Restraint Systems, to the extent they have not already been produced to Settlement Class Counsel.

(d)     Documents, if any, concerning Autoliv's determinations of its prices for products comprising the Occupant Safety Restraint Systems that it sells in the United States or for installation in vehicles that are known to be exported to the United States, including pricing policies, formulas and guidelines, including Documents concerning the relationship between prices charged or submitted to different OEMs or to the same OEM for different models.

(e)     Documents, if any, concerning Occupant Safety Restraint Systems that were collected and reviewed in connection with Autoliv's internal investigation but were not provided to or seized by Government Entities and that are relevant to the claims and allegations in the Complaint.

(f)      Documents, if any, showing how employees were trained or instructed to bid and set prices submitted to purchasers or potential purchasers, for products comprising Occupant Safety Restraint Systems, in RFQs, or any other procurement process, including Documents stating the lowest bid or price employees were authorized to submit, how to determine the lowest allowable bid or price, and when and how to increase or decrease a proposed bid or price.

Autoliv Settlement Agreement ¶¶ 32-33.

TRW's obligation to cooperate includes, among many other things, the duty to provide:

33.      Except as set forth therein, TRW will: (i) produce all English translations, to the extent they exist, of the Documents described in Paragraph 33(b)-(c) within fifteen (15) business days after Preliminary Approval by the Court of this Agreement; and (ii) substantially complete the production of the following Documents in TRW's possession, custody or control, set forth in subparagraphs (a)-(c) no later than forty-five (45) calendar days after Preliminary Approval by the Court of this Agreement:

(a)      Transactional data that was produced to the Automobile Dealer Settlement Class pursuant to Paragraph 32 of the Settlement Agreement between and among TRW and Automobile Dealership Plaintiffs, dated September 20, 2014, 2:12-cv-00602-MOB-MKM, Doc. No. 76-2 ("ADP Agt."), which data includes transactional data kept in the ordinary course of TRW's business, and to the extent that it exists in TRW's electronic databases and is reasonably accessible, concerning TRW's bids, price submissions and sales of Occupant Safety Restraint Systems to Original Equipment Manufacturers or other purchasers of Occupant Safety Restraint Systems from January 2, 2001 to two years from the Execution of the ADP Agt., including the following information: (1) the date for each bid, price submission or sale; (2) the price submitted in each bid or price submission; (3) bids and price submissions formulated but not submitted due to agreements or understandings with co-conspirators; (4) the final price of each sale; (5) the purchaser to whom each bid or price submission was submitted and each sale was made; (6) the model, model year(s), and brand of vehicle for which each bid or price submission was submitted and each sale was made, as well as the country of sale of said vehicles; (7) the total quantities of products comprising Occupant Safety Restraint Systems sold in each sale; (8) the location where each bid or price submission was submitted and each sale was made; (9) the TRW entity that submitted each bid or price submission and made each sale; (10) the sale agreements and contracts for each sale; (11) value engineering and other price

20

adjustments made to the products comprising Occupant Safety Restraint Systems sold in each sale, including through annual price reductions; (12) any ancillary costs associated with each sale such as tooling costs; (13) the identity of any other bids or prices submitted by competitors, including each winning bid; (14) the specifications for each bid or price submission; (15) adjustments made to each bid as it was being formulated; (16) TRW's profits, losses and margins on the products comprising Occupant Safety Restraint Systems; and (17) any other transactional data reasonably agreed to in writing between TRW's counsel and Settlement Class Counsel. TRW will not be obligated to produce any data for bids or proposals which have not been accepted, agreed to, or awarded. Except as provided herein, TRW will only produce the data that exists as of the Execution Date  of the ADP Agt. and within two years of the Execution Date of same and will not be obligated to do any analyses of the data for Settlement Class Counsel, outside of the interviews described in Paragraph 36(b), but will respond to reasonable inquiries from Settlement Class Counsel concerning the transactional data. TRW will provide any English translations of the above documents that may exist as of the Execution Date of the ADP Agt. and within two years of the Execution Date of same. With respect to any electronic transactional data generated within the two years after the Execution Date of the ADP Agt., as referred to in this paragraph, TRW shall have no on-going obligation to produce such data as it is generated. However, TRW will provide, in response to a written request from Settlement Class Counsel to be made no sooner than two years after the Execution Date of the ADP Agt., a single production of electronic transactional data generated during the two years after the Execution Date of the ADP Agt., as it exists in TRW's electronic databases, at the time of the request. TRW will  preserve such data for two years after the Execution Date of the ADP Agt. TRW will produce transactional data only from existing electronic transaction databases and will not be required to compile any data from individual invoices or individual personal computers except that to the extent that TRW has not recorded or maintained electronic transaction data from any period between January 1, 2001 and two years after the Execution Date of the ADP Agt., TRW will use reasonable efforts to produce records of those sales transactions not recorded or maintained electronically in the existing electronic  sales transaction databases. Additionally, TRW will provide to TED Plaintiffs any electronic transactional data including documents falling into the above categories that is provided to plaintiffs in any other case involving Occupant Safety Restraint Systems claims in the Automotive Parts Litigation, 12-md-02311.  Notwithstanding any other provision in this Agreement, TED Plaintiffs agree that

they, Settlement Class Counsel and their experts shall maintain the transactional data that TRW will produce as "Highly Confidential," as said designation is described in the Protective Order in this Action (Case No. 12-cv-0600, Doc. No. 77), except as provided herein and subject to any challenge that any party may make on a categorical basis, subject to the Protective Order and any orders of the Court. The first installment of such data shall be produced within thirty (30) days after Preliminary Approval of this Agreement by the Court. The second installment shall be produced at the same time such data is produced to the Automobile Dealership Plaintiffs. TRW represents that this transactional data that was searched and produced to the Automobile Dealer Settlement Class pursuant to the ADP Agt. did not make any exclusions based on the type of OSS product. If a good faith basis exists for searching for additional Truck and Equipment data that TRW did not originally search for in 2012-2013, TRW shall perform reasonable searches and produce responsive data to TED Plaintiffs within a mutually agreeable timeframe.

(b)      Documents, if any, provided to or seized by Government Entities as of the Execution Date of this Agreement relating to their investigation into alleged competition violations with respect to Occupant Safety Restraint Systems, to the extent such documents were created in the ordinary course of business. TRW shall not be required to disclose to Settlement Class Counsel the specific Government Entities to which documents were provided or by which documents were seized. The documents referenced herein shall be same documents that were produced to the Automobile Dealership Plaintiffs pursuant to Paragraph 32(b) of the ADP Agt. TRW represents that its review and production did not make any exclusions based on the type of OSS product (i.e., products for Truck and Equipment applications). If a good faith basis exists for searching for additional Truck and Equipment documents that TRW did not originally search for in 2012-2013, TRW shall perform reasonable searches and produce responsive documents to TED Plaintiffs within a mutually agreeable timeframe.

(c)      Non-privileged documents that are reasonably accessible that are sufficient to show TRW's general methodology for determination of its prices and bids for the products comprising the Occupant Safety Restraint Systems that it sells, including pricing policies, formulas and guidelines, including documents concerning the relationships between prices charged or submitted to different OEMs or to the same OEM for different models. The documents referenced herein shall be same documents that were

produced to the Automobile Dealership Plaintiffs pursuant to Paragraph 32(c) of the ADP Agt.  TRW represents that its review and production did not make any exclusions based on the type of OSS product  (i.e., products for Truck and Equipment applications).  If a good faith basis exists for searching for additional Truck and Equipment documents as referenced herein that TRW did not originally search for in 2012-2013, TRW shall perform reasonable searches and produce responsive data to TED Plaintiffs within a mutually agreeable timeframe.

(d)    Non privileged documents concerning Occupant Safety Restraint Systems, collected and reviewed in connection with TRW's internal investigation, that are relevant to the allegations in the Complaint, or that have been identified by TRW as relating to or concerning a communication, meeting, or agreement regarding Occupant Safety Restraint Systems, by any employee, officer or director of TRW with any employee, officer or director of another manufacturer or seller of Occupant Safety Restraint Systems, but that were not provided to or seized by Government Entities.  The documents referenced herein shall be same documents that were produced to the Automobile Dealership Plaintiffs pursuant to Paragraph 32(d) of the ADP Agt.  TRW represents that this production did not make any exclusions based on the type of OSS product (i.e., products for Truck and Equipment applications).  If a good faith basis exists for searching for additional Truck and Equipment documents as referenced herein that TRW did not originally search for in 2012-2013, TRW shall perform reasonable searches and produce responsive data to TED Plaintiffs within a mutually agreeable timeframe.

(e)    Documents that are reasonably accessible sufficient to show how employees were trained or instructed to bid and set prices submitted to purchasers or potential purchasers, for products comprising Occupant Safety Restraint Systems, in RFQs, or any other procurement process, including documents stating the lowest bid or price employees were authorized to submit, how to determine the lowest allowable bid or price, and when and how to increase or decrease a proposed bid or price.  The documents referenced herein shall be same documents that were produced to the Automobile Dealership Plaintiffs pursuant to Paragraph 32(e) of the ADP Agt.  TRW represents that this production did not make any exclusions based on the type of OSS product (i.e., products for Truck and Equipment applications). If a good faith basis exists for searching for additional Truck and Equipment documents as referenced herein that TRW did not originally search for in 2012-2013, TRW shall perform reasonable searches and

produce responsive data to TED Plaintiffs within a mutually agreeable timeframe.

(TRW Settlement Agreement ¶ 33.)

**Released Claims:** As set forth more fully in the respective Settlement Agreements, the Settlement Agreements release only the Settling Defendants and their past and present parents, subsidiaries, affiliates, partners, and insurers (and their respective past and present officers, directors, employees, agents, stockholders, representatives, and insurers, and their respective predecessors, successors, heirs, executors, administrators, and assigns) from Settlement Class Members' and other Releasors' claims on account of, or in any way related to, the conduct alleged or that could have been alleged in the VWHS Complaint and/or OSS Complaint or any act or omission of Settling Defendants or any other Releasee concerning VWHS and/or OSS.[2]

The release does not include certain claims, including: (1) any claims based on direct purchases of such parts, modules, or assemblies; (2) any claims made by any State, State agency, or instrumentality or political subdivision of a State, as to government purchases and/or penalties relating to such parts, modules, or assemblies; (3) claims based on negligence, personal injury, breach of contract, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, warranty, securities, or similar claim relating to such parts, modules, or assemblies; and (4) claims under laws other than those of the United States and the states thereof relating to purchases of VWHS made by Releasors outside of the United States. *See, e.g.*, DENSO Settlement Agreement at ¶ 24. The Settlement Agreements also provide that the Settling Defendants' sales shall remain in the continuing litigation against the non-settling Defendants,

---

[2] The DENSO Settlement Agreement releases DENSO for any act or omission of DENSO or any other Releasee concerning the sale of parts, modules, or assemblies for incorporation into any Trucks and Equipment.

DM1\7152026.3

who remain jointly and severally liable for all damages caused by the conspiracies.  *See, e.g.*, DENSO Settlement Agreement at ¶ 56.

**Plan for Dissemination of Notice to Potential Members of the Settlement Classes:**

Settling Defendants' Settlement Agreements provide cash benefits to dealerships that purchased certain parts and/or purchased vehicles containing those parts in jurisdictions that the TED Plaintiffs contend allow antitrust indirect purchasers to seek money damages: Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Included States").  Through a class action notice consultant, mailing addresses for approximately 33,000 potential class members in the Included States have been identified.  (*See* Declaration of William Wickersham, attached hereto as Exhibit 7).

To provide notice of these Settlements to potential class members, TED Plaintiffs propose a multi-faceted notice program intended to provide the best notice practicable under the circumstances.  TED Plaintiffs retained RG/2, an experienced class-notice consultant, to design and implement the notice plan.  RG/2 has proposed a notice plan that includes:

- Direct mail and email notice to approximately 33,000 dealerships potentially eligible for monetary benefits under the Settlements;

- Published notice in periodicals like *The Wall Street Journal*, *Automotive News*, National Trailer Dealers Association E-newsletter, the American Truck Dealers Insider E-newsletter, and *World Truck Magazine* designed to target potential class members nationwide; and

- Earned media efforts through a national press release and the settlement website, www.TruckDealerSettlement.com.

(*See* Ex. 7).

25

**ARGUMENT**

The Settlement Agreements are fair, reasonable, and adequate, and they are the result of arm's length negotiations by experienced counsel.  They are also a thoughtfully conceived resolution of the proposed Settlement Classes' claims that maximize their recovery and guarantee early, significant cooperation by Settling Defendants in the continued prosecution of TED Plaintiffs' claims.

**I.      Preliminary Approval Should be Granted Because the Proposed Settlements Fall Well Within the Range of Possible Approval.**

It is well-established in the Sixth Circuit that there is an overriding public interest in settling and quieting litigation, particularly class actions.  *See Griffin v. Flagstar Bancorp, Inc.*, Case No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702, at *6 (E.D. Mich. Dec. 12, 2013) (citing *UAW v. Gen. Motors. Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (noting "the federal policy favoring settlement of class actions")); *see also IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006). "This policy applies with equal force whether the settlement is partial, involving only some of the defendants, or complete."  *In re Packaged Ice Antitrust Litig.*, Case No. 08-MD-01952, 2011 U.S. Dist. LEXIS 17255, at *44 (E.D. Mich. Feb. 22, 2011); *see also Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) ("In complex litigation with a plaintiff class, 'partial settlements often play a vital role in resolving class actions'" (quoting MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.46 (1986)). In fact, "settlement should be facilitated at as early a stage of the litigation as possible." 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1522, at 225-26 (2d ed. 1990) (citing 1983 Advisory Committee Notes); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.12 (2004) ("*Manual*") ("[S]ettlement should be explored early in the case.").

26

Approval of a proposed class action settlement proceeds in two steps.  First, the court grants preliminary approval to the settlement and provisionally certifies a settlement class. Second, after notice of the settlement is provided to the class and the court conducts a fairness hearing, the court may grant final approval to the settlement.  *See Manual* § 21.63; *see also Bobbitt v. Acad. of Reporting*, 2009 WL 2168833, at *1 (E.D. Mich. Jul. 21, 2009) (citing authorities).

A proposed settlement agreement should be preliminarily approved if "the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies . . . and [the settlement] appears to fall within the range of possible approval."  *Manual* § 30.41 at 237; *see also Int'l Union, UAW v. Ford Motor Co.*, Case Nos. 05-74730, 06-10331, 2006 U.S. Dist. LEXIS 70471, at *11 (E.D. Mich. July 13, 2006).  The district court's role in reviewing settlements "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Clark Equip. Co. v Int'l Union of Allied Industrial Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986).  Courts adhere to "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2005) ("*Newberg*") (collecting cases); *cf. Rankin v. Rots*, No. 02-cv-71045, 2006 U.S. Dist. LEXIS 45706, at *9 (E.D. Mich. June 28, 2006) ("[T]he only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.") (internal quotation marks omitted).

In considering whether to grant preliminary approval, the court is not required at this point to make a final determination of the adequacy of the settlement or to delve extensively into the merits of the settlement. *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, Case No. 1:01-CV-9000, 2001 U.S. Dist. LEXIS 26714, at *17 (E.D. Ohio Oct. 19, 2001) ("*Sulzer Hip*"). These inquiries are reserved for the final approval stage of the class settlement approval process. Nor will any class member's substantive rights be prejudiced by preliminary approval because the proposed preliminary approval is solely to provide authority for notifying the class of the terms of the settlement agreement to set the stage for review of its final approval. *Id.*; *Newberg* § 11.25. Consequently, courts generally engage only in a limited inquiry to determine whether a proposed settlement falls within the range of possible approval and thus should be preliminarily approved. *Sulzer Hip*, 2001 U.S. Dist. LEXIS 26714, at *17-18 (preliminary approval may be based on "informal presentations" because of "substantial judicial processes that remain") (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41, at 235 (1995)). *See also Packaged Ice*, No. 08-MD-01952, 2010 WL 3070161, at *4 (E.D. Mich. Aug. 2, 2010) (quoting *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982)) (inquiry limited to settlement's potential for final approval and propriety of class notice and fairness hearing).

In evaluating whether a settlement is fair, reasonable and adequate, courts in the Sixth Circuit consider a number of factors:

> (1) the likelihood of success on the merits weighed against the amount and form of relief in the settlement; (2) the complexity expense and likely duration of the litigation; (3) the opinions of class counsel and class representatives; (4) the amount of discovery engaged in by the parties; (5) the reaction of absent class members; (6) the risk of fraud or collusion; and (7) the public interest. The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case.

*Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *46-47 (quotation marks and citations omitted).

A court is not required, at the preliminary approval stage, to determine whether it ultimately will finally approve the settlement. Nevertheless, as set forth in detail below, preliminary consideration of the factors a court considers when evaluating the fairness of a settlement for purposes of deciding whether to grant final approval supports this Court's granting preliminary approval of the Settlement Agreement.

### A. The Settlement Agreements Achieve an Excellent Result for the Proposed Settlement Classes, Particularly Given the Expense, Duration, and Uncertainty of Continued Litigation.

Antitrust class actions are "arguably the most complex action(s) to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." *In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 U.S. Dist. LEXIS 150427, at *76 (E.D. Mich. Dec. 13, 2011) (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003) ("*Linerboard*")); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("*Cardizem*") ("Moreover, the complexity of this case cannot be overstated. Antitrust class actions are inherently complex"). Motions have already been vigorously contested, and the discovery process would be all the more complicated due to the unique issues that attend discovery against foreign parties.[3]

DENSO has filed a Motion for Judgment on the Pleadings that is fully briefed and pending. [2:14-cv-00107-MOB-MKM, Doc. Nos. 33, 38, and 41.] Similarly, TRW and Autoliv have filed Motions to Enforce Stay of Proceedings seeking a determination that their respective settlement agreements with the Auto Dealer Plaintiffs resolved all claims relating to Trucks and/or Equipment. [2:15-cv-12050-MOB-MKM, Doc. No. 7.] DENSO, TRW and Autoliv have asserted and would continue to assert various defenses, and a jury trial might well turn on close

---

[3] Because counsel may have to litigate against the other Defendants through trial and appeal, their duties to the Class preclude a more detailed discussion of their potential litigation risks.

questions of proof, many of which would be the subject of complicated expert testimony, particularly with regard to injury and damages, making the outcome of such trial uncertain for both parties. *See, e.g.*, *Cardizem*, 218 F.R.D. at 523 (in approving settlement, noting that "the prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery and that "no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation"); *Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *53-54 (noting the "undeniable inherent risks" in antitrust class action litigation including "whether the class will be certified and upheld on appeal, whether the conspiracies as alleged in the Complaint can be established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages"). *Id.* Given this uncertainty, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995). This is particularly true in the context of the broader MDL Proceeding, where DENSO would have argued that it was subject to limited liability in cases asserting claims for parts other than VWHS because, as the leniency applicant in many of those cases, it would not have been subject to joint and several liability and treble damages in those cases under the Antitrust Criminal Penalty Enforcement Reform Act ("ACPERA"), Pub. L. No. 108-237, § 213(a)-(b), 118 Stat. 661, 666-69 (June 22, 2004), *as amended by* Pub. L. No. 111-190, 124 Stat. 1275 (June 9, 2010).

Moreover, given the stakes involved, an appeal is nearly certain to follow regardless of the outcome at trial. This creates additional risk, as judgments following trial may be overturned on appeal. *See, e.g.*, *In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007) ($52.5 million class action judgment following trial reversed on

appeal); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs reversed and judgment entered for defendant).  And even if class members were willing to assume all of the litigation risks, the passage of time would introduce still more risks in terms of appeals and possible changes in the law that would, in light of the time value of money, make future recoveries less valuable than recovery today.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[A] future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Class than receiving the benefits of the proposed Settlement at this time").  Hence, "the certain and immediate benefits to the Class represented by the Settlement outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal." *Cardizem*, 218 F.R.D. at 525.

Against this background, settlements providing the substantial benefits afforded here represent an excellent result for the members of the proposed Settlement Classes.  Settling Defendants' collective $2,807,500 in payments provides for significant compensation to the proposed Settlement Class that will be available years earlier than would be the case if litigation against Settling Defendants continued through trial and appeal.  Settlements of this type, before discovery has been completed, create value beyond their direct pecuniary benefit to the class. *See Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *50-51 (noting "significant value" of icebreaker settlement); *Linerboard*, 292 F. Supp. 2d at 643; *In re Corrugated Container Antitrust Litig.*, 1981 WL 2093, *16 (S.D. Tex. Jan. 27, 1981 ("*Corrugated Container*").  In addition, the

DENSO Settlement Agreement provides for injunctive relief that will inure to the benefit of all members of the Settlement Classes—specifically, DENSO has agreed to be enjoined for a period of two years from entry of a final order and judgment in this case from engaging in any price-fixing, bid-rigging, or market allocation in violation of Section 1 of the Sherman Act.

The Settlement Agreements require Settling Defendants to provide substantial cooperation to the TED Plaintiffs' counsel by providing transactional data, factual proffers, interviews, documents, depositions, and trial testimony, among other cooperation. *See, e.g.*, DENSO Settlement Agreement § J (¶¶ 34-50).

This cooperation is extremely valuable to this case, and, with respect to DENSO's cooperation, to other cases in the MDL Proceeding. The effective cooperation facilitated by the respective Settlement Agreements will afford the TED Plaintiffs access to transactional data, documents, and witnesses without protracted and expensive discovery—a significant class-wide benefit that, with respect to DENSO's cooperation, will assist not just in this case, but in all auto part cases asserted by TED Plaintiffs. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, Case No. 08-MD-01952, 2010 U.S. Dist. LEXIS 77645, at *44 (E.D. Mich. Aug. 2, 2010) ("Particularly where, as here, there is the potential for a significant benefit to the class in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation"); *see also Linerboard*, 292 F. Supp. 2d at 643; *Corrugated Container*, 1981 WL 2093, at *16; *cf. In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) ("[T]he benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment.").

32

The respective Settlement Agreements also specifically provide that they do not alter the non-settling Defendants' joint and several liability for the full damages caused by the alleged conspiracies, including all sales made by the Settling Defendants. *See, e.g.*, DENSO Settlement Agreement ¶ 56. In this regard, the Settlement Agreements are similar to one of the settlements approved in *Corrugated Container*, where the court noted the "valuable provision" under which plaintiffs reserved their right to recover full damages from the remaining defendants, less the actual amount of the initial settlement. 1981 WL 2093, at *17; *see also In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980); *In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979) (approving settlement where class will "relinquish no part of its potential recovery" due to joint and several liability). Here too, the TED Plaintiffs will be able to pursue their full damages, with no diminution other than deduction of the actual Settlement Amounts.

### B. The Settlement Agreements Are the Result of Thorough Arm's-Length Negotiations Conducted by Highly Experienced Counsel.

These settlements are entitled to "an initial presumption of fairness" because they are the result of arm's-length negotiations among experienced counsel. *Newberg* § 11.41. The judgment of proposed Settlement Class Counsel that the settlements are in the best interest of the proposed Settlement Classes "is entitled to significant weight, and supports the fairness of the class settlement." *Sheick v. Auto Component Carrier LCC*, Case No. 2:09-cv-14429, 2010 U.S. Dist. LEXIS 110411, at *51 (E.D. Mich. Oct. 18, 2010) (quoting *IUE-CWA*, 238 F.R.D. at 597); *see also Cardizem*, 218 F.R.D. at 525. Courts give great weight to the recommendation of experienced counsel for the parties in evaluating the adequacy of a settlement.

"Preliminary approval of a proposed settlement is based upon the court's familiarity with the issues and evidence, as well as the arms-length nature of the negotiations prior to the proposed settlement, ensuring that the proposed settlement is not illegal or collusive." *Thacker*

33

*v. Chesapeake Appalachia, L.L.C.*, 259 F.R.D. 262 (E.D. Ky. 2009) (quoting *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 370 (S.D. Ohio 1990)).  The respective Settlement Agreements here are the result of hard-fought negotiations between counsel experienced in complex antitrust and consumer class action litigation.  The respective Settlement Agreements were negotiated by proposed Interim Class Counsel in a process that involved multiple discussions with counsel for Settling Defendants.  Proposed Interim Class Counsel undertook a diligent and thorough investigation of the legal and factual issues posed by this litigation and consulted extensively with experienced economists before negotiating these deals.

Counsel for the TED Plaintiffs was well-informed about the facts and the strength of the claims asserted having had access to extensive discovery, including document productions, interrogatory responses, and depositions, at the time the terms of the respective Settlement Agreements were negotiated.  *See Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *56 ("[T]he absence of formal discovery is not an obstacle [to settlement approval] so long as the parties and the Court have adequate information in order to evaluate the relative position of the parties.") (quotation marks and citation omitted); *Griffin v. Flagstar Bancorp, Inc.*, 2013 U.S. Dist. LEXIS 173702 (same).

Moreover, these negotiations were adversarial and conducted in the utmost good faith. "Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 838 (E.D. Mich. 2008); *Bowers v. Windstream Ky. East, LLC*, Civil Action No. 3:09-CV-440-H, 2013 U.S. Dist. LEXIS 157242, at *5 (W.D. Ky. Nov. 1, 2013).  There is nothing in the course of the

negotiations or the substance of the settlement that "disclose[s] grounds to doubt [their] fairness." *Manual* § 30.41.

## II.     The Proposed Settlement Classes Should be Provisionally Certified Pursuant to Rule 23.

The Manual notes the propriety of certifying a class solely for purposes of settlement, *see Manual* § 21.32, and courts in this Circuit routinely provisionally approve a proposed settlement class before deciding plaintiffs' motion for class certification. *See, e.g., In re Delphi Corp. Sec. Derivatives & ERISA Litig.*, 248 F.R.D. 483, 486 n. 2 (E.D. Mich. 2008) (granting final approval to both ERISA and Securities settlement Class, noting the court's earlier, preliminary approval of the settlement Class granted prior to a hearing on defendants' motions to dismiss); *Cardizem*, 218 F.R.D. at 516-17, 530 (granting final approval of proposed settlement, noting its earlier preliminary approval of both the proposed settlement class and the proposed settlement agreement granted prior to class certification and prior to hearing on motions to dismiss). A court may grant provisional certification where, as here, the proposed settlement classes satisfy the four prerequisites of Rule 23(a) (numerosity, commonality, typicality and adequacy), as well as one of the three subsections of Rule 23(b). *See In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 U.S. Dist. LEXIS 140235, at *27-28 (E.D. Mich. Sept. 2, 2010).

While the Supreme Court recently reiterated that a trial court must conduct a "rigorous analysis" to confirm that the requirements of Rule 23 have been met, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), "the requisite 'rigorous analysis' of the record and consideration of the merits must be focused on and limited to the question whether the Rule's requirements have been established." *Cason-Merenda v. VHS of Mich., Inc.*, 2013 U.S. Dist. LEXIS 131006, at *20-21 (E.D. Mich. Sept. 13, 2013) (citing *In re Whirlpool Corp. Front-*

35

*Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013)).  Permissible inquiry

into the merits of plaintiffs' claims at the class certification stage is limited:

> Rule 23 grants courts no license to engage in free-ranging merits
> inquiries at the class certification stage.  Merits questions may be
> considered to the extent—but only to the extent—that they are
> relevant to determining whether the Rule 23 prerequisites for class
> certification are satisfied.

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Amgen")

(citing *Dukes*, 131 S. Ct. at 2552 n.6).  "In other words, district courts may not turn the class

certification proceedings into a dress rehearsal for the trial on the merits." *In re Whirlpool

Corp.*, 722 F.3d 838, 851-52 (internal quotation marks and citation omitted).  Here, as

demonstrated below, even under a "rigorous analysis," the requirements of Rule 23 are easily

met.

### A.    The Proposed Settlement Classes Meet the Requirements of Rule 23(a).

Horizontal price fixing class actions are routinely certified in this District and elsewhere.

TED Plaintiffs' allegations of "a per se violation of the antitrust laws are exactly the kind of

allegations which may be proven on a class-wide basis through common proof." *In re

Southeastern Milk Antitrust Litig.*, Master File No. 2:09-MD-1000, 2010 U.S. Dist. LEXIS

94223, at *35 (E.D. Tenn. Sept. 7, 2010).  "Courts have held that the existence of a conspiracy is

the predominant issue in price fixing cases, warranting certification of the class even where

significant individual issues are present." *Id.* at *33 (internal quotation marks and citations

omitted). "As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as

well suited for class treatment." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 409 (S.D.

Ohio 2007); *see also Hyland v. Homeservices of Am., Inc.*, Case No. 3:05-CV-612-R, 2008 U.S.

Dist. LEXIS 90892, at *12 (W.D. Ky. Nov. 6, 2008).

36

###### i.     The Proposed Settlement Classes are so Numerous That it is Impracticable to Bring All Class Members Before the Court.

No magic number is required to satisfy the numerosity requirement of Rule 23(a)(1). *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 288 (S.D. Ohio 2006).  A class representative need only show that joining all members of the potential class is extremely difficult or inconvenient. *Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005).  The "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 403 (citing *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004)); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

The proposed Settlement Classes at issue in this action involve all Truck and Equipment Dealerships in the U.S. from July 1, 1999, in the case of VWHS, and from January 1, 2003, in the case of OSS, through the respective Execution Dates that purchased one or more new Trucks and/or Equipment containing a relevant part.  Because there are a large number—estimated to be over one thousand—of such Truck and Equipment dealerships geographically distributed throughout the United States, joinder is highly impractical, if not impossible, for all of the proposed Settlement Classes.

###### ii.    TEDP Class Representatives and the Proposed Settlement Classes Share Common Legal and Factual Questions.

Commonality only requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  While Rule 23(a)(2) speaks of questions of law or fact in the plural, "there need be only one common question to certify a class." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d at 853; *see also Cason-Merenda*, 2013 U.S. Dist. LEXIS 131006, at *22 (one common question of law or fact is sufficient); *Griffin v. Flagstar*

*Bancorp Inc.*, 2013 U.S. Dist. LEXIS 173702 (same); *Date v. Sony Elecs., Inc.*, Case No. 07-

15474, 2013 U.S. Dist. LEXIS 108095, at *10 (E.D. Mich. July 31, 2013) (same).

This prerequisite is readily satisfied here because "antitrust price-fixing conspiracy cases,

by their nature, deal with common legal and factual questions about the existence, scope and

effect of the alleged conspiracy." *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609,

613 (D. Kan. 1995). Thus, in price fixing cases, courts "have consistently held that the very

nature of a conspiracy in an antitrust action compels a finding that common questions of law and

fact exist." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486

PJH, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006); *see also Newberg* § 3:10 at 278

("[In an] antitrust action on behalf of purchasers who have bought defendants' products at prices

that have been maintained above competitive levels by unlawful conduct, the courts have held

that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the

Rule 23(a)(2) prerequisite").

Through the course of this litigation, TED Plaintiffs have already identified the following

issues common to the proposed Settlement Classes:

- Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of or rig bids for VWHS and/or OSS sold in the United States;

- Whether Defendants and their co-conspirators agreed to allocate the supply of VWHS and/or OSS sold in the United States;

- The identity of the participants of the alleged conspiracies;

- The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the alleged conspiracies;

- Whether any of the alleged conspiracies violated the Sherman Act;

- Whether any of the alleged conspiracies violated state antitrust and unfair competition laws;

- Whether the conduct of Defendants and their co-conspirators, as alleged in the VWHS Complaint and/or OSS Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

- The effect of the alleged conspiracies on the prices of VWHS and/or OSS sold in the United States during the respective Class Periods;

- Whether the Defendants and their co-conspirators fraudulently concealed the alleged conspiracies' existence from the Plaintiffs and the members of the Classes;

- Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants;

- The appropriate injunctive and related equitable relief for the Nationwide Classes; and

- The appropriate class-wide measure of damages for the Damages Classes.

*See* VWHS Complaint ¶ 240; OSS Complaint ¶ 182.  Any one of these substantive issues would, standing alone, establish the requisite commonality under Rule 23(a)(2).

### iii.   TEDP Class Representatives' Claims are Typical of the Claims of the Members of the Proposed Settlement Classes.

Third, Rule 23(a) requires typicality of the class representatives' claims.  *See* Fed. R. Civ. P. 23(a)(3). "The [typicality] requirement is not onerous," *Int'l Union, UAW v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 70471, at *54, and courts liberally construe it.  *See In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 403.  "In the antitrust context, typicality is established when the named plaintiffs and all class members allege[] the same antitrust violation by defendants." *Cason-Merenda*, 2013 U.S. Dist. LEXIS 131006, at *25 (quoting *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 405); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000); *In re Am. Med. Sys.*, 75 F.3d at 1082; *Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *40-41. "If there is a strong similarity of legal theories, the requirement [of typicality] is met, even if there are factual distinctions among named and absent class members."  *Griffin v. Flagstar Bancorp,*

*Inc.*, 2013 U.S. Dist. LEXIS 173702, at *17-18 (quotation marks and citation omitted); *Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *40 (same).

Because the TED Plaintiffs and the members of the proposed Settlement Classes believe they are all victims of a common conspiracy to fix prices, rig bids, and allocate the market and customers for the relevant parts and seek the same relief, Rule 23(a)(3) is satisfied.  *See Cason-Merenda*, 2013 U.S. Dist. LEXIS 131006, at *26 (finding typicality met where "the claims of the named Plaintiffs and those of the remaining members of the proposed class all arise from the same conspiracy and are based on the same theory of liability under the Sherman Act.") (internal quotation marks and citation omitted)); *Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *40-41 ("Because all Class Members' claims arise from . . . a conspiracy to allocate markets in violation of the Sherman Act, their claims are based on the same legal theory and the typicality requirement . . . is met").

### iv.    Proposed Settlement Class Counsel and TEDP Class Representatives Will Fairly and Adequately Protect the Interests of the Proposed Settlement Classes.

The final requirement of Rule 23(a) is that the representative parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The Sixth Circuit has articulated two criteria for determining adequacy of representation: "'1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 407 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).  TED Plaintiffs submit that there are no conflicts between them and the proposed Settlement Classes because the TED Plaintiffs and all members of the Settlement Classes purchased new Trucks and/or Equipment in the United States that included one or more VWHS and/or OSS as a component part, or indirectly purchased one or more

40

VWHS and/or OSS as a replacement part, and all seek damages for the alleged ensuing overcharges. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes" (internal quotation marks and citation omitted)). TED Plaintiffs and the members of the proposed Settlement Classes also share a common interest in obtaining Settling Defendants' substantial cooperation in prosecuting the claims against the non-settling Defendants.

Rule 23(g) requires the Court to examine the capabilities and resources of class counsel to determine whether they will provide adequate representation to the class. The proposed Settlement Classes are represented by counsel with extensive experience in antitrust and class action litigation. They have vigorously prosecuted the class claims, and they will continue to do so through all phases of the litigation, including trial. *See Marcus v. Dep't of Revenue*, 206 F.R.D. 509, 512 (D. Kan. 2002) ("In absence of evidence to the contrary, courts will presume the proposed class counsel is adequately competent to conduct the proposed litigation"). The Court should appoint them Settlement Class Counsel here.

**B.     The Proposed Settlement Classes Meet the Requirements of Rule 23(b)(3).**

To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) ("*Amchem*"); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008). With respect to both requirements, the Court need not inquire

41

whether the "case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (internal citations omitted).

### i.      Common Questions of Law and Fact Predominate.

"Rule 23(b)(3) does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to classwide proof." *In re Whirlpool Corp.*, 722 F.3d at 859.  Instead, "'[a] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individualized position.'" *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 408 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 307).  Common questions need only predominate; they need not be dispositive of the litigation.  *Id.* (citing *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995)); *cf. In re Scrap Metal Antitrust Litig.*, 527 F.3d at 535-36 (holding issues regarding the amount of damages do not destroy predominance).  "[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Cason-Merenda v. VHS of Mich., Inc.*, 2013 U.S. Dist. LEXIS 131006, at *19-20 (quoting *Powers v. Hamilton Cnty. Public Defender Comm.*, 501 F.3d 595, 619 (6th Cir. 2007)).  As pertinent to TED Plaintiffs' request here to provisionally certify the proposed Settlement Classes under Rule 23(b)(3), the Supreme Court very recently instructed that "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 133 S. Ct. at 1191.[4]

---

[4] The Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), supports the appropriateness of class certification under Rule 23(b)(3) here. In *Comcast*, the Supreme Court found that the plaintiffs failed to establish that damages could be measured on a class-wide basis because only one of the plaintiffs' four theories of antitrust impact could be proved in a

Because the proposed Settlement Classes allege conduct from which all proposed

members of the Settlement Classes alleged injuries arise, issues common to the proposed

members of the Settlement Classes—for example, the existence and scope of the alleged price-

fixing conspiracy or conspiracies among Defendants, the market impact of Defendants'

conspiracy or conspiracies, and the aggregate amount of damage suffered by the class as a result

of the alleged antitrust violations—predominate over any individual questions, and therefore

class treatment of the claims is appropriate for purposes of this settlement.  *See Amchem*, 521

U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the

antitrust laws."); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 254 (D.D.C. 2002)

("[A]s a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance

of common questions[.]") (quoting NEWBERG ON CLASS ACTIONS § 18.28 at 18-98 (3d ed.

1992)).  This Circuit has also held that "[p]redominance is a test readily met in certain cases

alleging . . . violations of the antitrust laws, because proof of the conspiracy is a common

question that is thought to predominate over the other issues of the case."  *In re Scrap Metal*

*Antitrust Litig.*, 527 F.3d at 535 (quoting *Amchem*, 521 U.S. at 625).[5]  Furthermore, here the

---

manner common to the class. 133 S. Ct. at 1429-31. Under *Comcast*, plaintiffs must be able to
show that their damages stemmed from the defendant's actions that created the legal liability.
*See Levva v. Medline Indus, Inc.*, 716 F.3d 510 (9th Cir. 2013). Here, all of the proposed
Settlement Class's claimed damages—the overcharge suffered as a result of inflated vehicle
components—stem from the Defendants' alleged price-fixing conspiracies.

[5] Other courts have recognized that the existence and scope of an alleged antitrust conspiracy are
matters susceptible to class-wide proof, and thus tend to support a finding that common issues
predominate over individual ones as to at least the first element of an antitrust conspiracy claim.
*See, e.g., Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105
(2d Cir. 2007); *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005); *In re Visa*
*Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001); *In re Blood Reagents*
*Antitrust Litig.*, 283 F.R.D. 222, 234 (E.D. Pa. 2012); *Reed v. Advocate Health Care*, 268 F.R.D.
573, 581 (N.D. Ill. 2009); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634 (D. Kan. 2008);
Foundry Resins, 242 F.R.D. at 408.

evidence that will prove a violation as to one member of the Settlement Classes is common to the others in the same Settlement Class and will be sufficient to prove it as to all—the anticompetitive conduct is not dependent on the separate conduct of the individual members of the Settlement Classes. *See Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *43.

This is true even if there are individual state law issues, as long as the common issues still outweigh the individual ones, *e.g.*, as long as a common theory can be alleged as to liability and impact that can be pursued by the class. *See, e.g., In re Whirlpool Corp.*, 722 F.3d at 861 ("[I]t remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." (internal quotation marks and citation omitted)); *Scrap Metal*, 527 F.3d at 535 (where common issues determine liability, fact that damages calculation may involve individualized issues does not defeat predominance). Issues common to the proposed Settlement Classes predominate in these cases—all TED Plaintiffs assert that they, along with the Truck and Equipment Dealerships they represent, paid overcharges that were caused by the Defendants' price-fixing activities. The presence of these common issues of liability and impact predominates over any individual issues and strongly support provisional certification of the proposed Settlement Classes.

### ii.     A Class Action is the Superior Method to Adjudicate These Claims.

Rule 23(b)(3) also requires that a class action be superior to other available methods of fairly adjudicating the controversy. The superiority of class certification over other available methods is measured by consideration of certain factors, including: the class members' interests in controlling the prosecution of individual actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability of concentrating the litigation of various claims in the particular forum; and the likely difficulties in

44

managing a class action. *Dillworth v. Case Farms Processing, Inc.*, No. 5:08-cv-1694, 2010 U.S. Dist. LEXIS 20446 (N.D. Ohio Mar. 8, 2010).

Courts consistently hold that class actions are a superior method of resolving antitrust claims like those alleged here. *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 678 (D. Kan. 2004) (noting that individual litigation of antitrust claims would be "grossly inefficient, costly, and time consuming"). Here, the interests of the members of the Settlement Classes in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism. *Cardizem*, 200 F.R.D. at 325-26 (finding that class action is superior because it ensures fair and efficient adjudication). Thousands, of Truck and Equipment Dealerships purchased Trucks and/or Equipment containing the relevant parts as component parts during the relevant settlement class periods; resolving these claims in the context of a class action would conserve both judicial and private resources and would hasten the class members' recovery. *See, e.g., In re Foundry Resins*, 242 F.R.D. at 411-12 ("Repeatedly litigating the same issues in individual suits would produce duplicate efforts, unnecessarily increase litigation costs, impose an unwarranted burden on this Court and other courts, and create a risk of inconsistent results").[6]

### C.    The Proposed Settlement Classes Meet the Requirements of Rule 23(b)(2).

If the requirements of Rule 23(a) are met, the Court may also certify a class under Rule 23 (b)(2) where: "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

---

[6] Another criterion of Rule 23(b)(3) is manageability. The Supreme Court has made clear that manageability need not be considered where, as here, a class is being certified for settlement purposes. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial").

appropriate respecting the class as a whole . . ." Claims for non-monetary relief, like those asserted under state laws that do not recognize claims for money damages by indirect purchaser in antitrust actions, are properly certified under Rule 23(b)(2).

### III.   The Court Should Approve the Form and Manner of Notice to the Members of the TED Settlement Classes.

Fed. R. Civ. P. 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]."  For Rule 23(b)(3) actions, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

### A.   Notice Standards and Requirements.

The purpose of notice in a class action is to "afford members of the class due-process which, in the context of the Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974)).  Due process requires that absent class members be provided the best notice practicable, reasonably calculated to apprise them of the pendency of the action, and affording them the opportunity to opt out or object.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

The "best notice practicable" does not mean actual notice, nor does it require individual mailed notice where there are no readily available records of class members' individual addresses or where it is otherwise impracticable.  *See Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 548-53 (N.D. Ga. 1992); MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.311, at 288 (2004) ("MANUAL").  The

46

mechanics of the notice process "are left to the discretion of the court subject only to the broad 'reasonableness' standard imposed by due-process." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975). Each class member need not receive actual notice for the due process standard to be met, "so long as class counsel acted reasonably in selecting means likely to inform persons affected." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D. N.Y. 1996).

Where names and addresses of known or potential class members are reasonably available, direct-mail notice should be provided. *See, e.g., Eisen*, 417 U.S. at 175-76; MANUAL, § 21.311, at 292. If the names and addresses of class members cannot be determined by reasonable efforts, notice by publication is sufficient to satisfy the requirements of the Due Process clause and Rule 23. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317-18 (1950); *Carlough v. Amchem Prods.*, 158 F.R.D. 314, 325 (E.D. Pa. 1993).

Due process is satisfied even if all class members do not receive actual notice, as long as the plan was reasonably likely to inform the persons affected. *See, e.g., Weigner v. The City of New York*, 852 F.2d 646, 649 (2d Cir. 1988). Whether a notice dissemination plan is reasonable is a function of the plan's anticipated results. *In re Domestic Air Transp.*, 141 F.R.D. at 539; *see also Berland v. Mack*, 48 F.R.D. 121, 129-30 (S.D.N.Y. 1969).

### B.     The Proposed Manner of Notice Satisfies the Requirements of Fed. R. Civ. P. 23(c)(2)(B) and (e)(1).

TED Plaintiffs propose providing notice through several different channels. Individual notice (the "Mailing Notice" attached as Exhibit 1 to the Proposed Order) will be mailed to the more than 33,000 known postal and email addresses associated with current and former dealerships in the Included States. The Mailing Notice will direct recipients to a settlement website ("Settlement Website") for additional information. (*See* Ex. 1 to the Proposed Order).

A summary notice (the "Publication Notice") will be published in: (1) one insertion in *The Wall Street Journal*, (2) one insertion in *Automotive News*, and (3) one insertion in *World Truck Magazine*. (*See* Ex. 2 to the Proposed Order.) The content of the Publication Notice will be the same as the Mailing Notice and will direct readers to the Settlement Website for further information. (*See id.*) A press release on a national newswire will be issued, directing readers to the Settlement Website for additional information. (*Id.*).

The Settlement Website will provide the definitions of the Settlement Classes, a detailed description of the Settlements, the settlement agreements, and the long-form Mailing Notice (Ex. 1 to the Proposed Order) that describes the options for participating in, seeking exclusion from, or objecting to the Settlements. The Settlement Website will also display, as the relevant information becomes available: (1) information about the proposed methods for allocating the settlement funds (the "Plans of Allocation"); (2) deadlines and Proof of Claim forms; (3) relevant court documents and filings; and (4) updates on the status of Court approval. The notices and the Settlement Website will also provide a toll-free telephone number that can be called for assistance or more information. (*See* Ex. 7).

To further supplement the Mailing and Publication notices, online notice efforts will also be used. For example, the address of the Settlement Website will run in National Trailer Dealers Association E-newsletter and American Truck Dealers Insider E-newsletter. (Ex. 7).

The methods of notice proposed here are the best available under the circumstances. The proposed methods are well-designed to reach potential members of the Settlement Classes and to comply with due process. Nearly all potential members of the Settlement Classes in the Included States will receive direct, mailed notice. The substantial "reach" for these potential class members clearly satisfies due process requirements. *See, e.g., Larson v. Sprint Nextel Corp.*, No.

07-5325, 2009 WL 1228443, at *11 (D.N.J. April 30, 2009). The "reach" of the notice proposed here far exceeds notice reach approved in other cases. *Id.* at *12 ("No case stands for the proposition that a publication notice reach of 49-53 percent is disallowed."). The Court should preliminarily approve the TED Plaintiffs' proposed notice plan and should allow the notice process to begin.

### C.   The Proposed Form of Notice Satisfies the Requirements of Fed. R. Civ. P. 23(c)(2)(B) and (e)(1).

The content of a class action settlement notice "must clearly and concisely state in plain, easily understood language" seven types of information: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

The long-form Mailing Notice and short-form Publication Notice are drafted in the "plain language" format preferred by federal courts and provide the information required by Rule 23. (*See* Exs. 1 & 2 to the Proposed Order). The notices were drafted with assistance from RG/2, an experienced and well-regarded class action settlement administration firm. RG/2 believes that these notices are understandable and compliant with due process. (*Id.*) The notices satisfy the content requirements of Federal Rule of Civil Procedure 23. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 496 (D.N.J. 1997); MANUAL at § 21.633.

At final approval, the TED Plaintiffs will show that the form and content of the notices, together with the manners of dissemination, were reasonably calculated to reach the members of

the Settlement Classes and were the best form of notice available under the circumstances, in satisfaction of federal law and due process.

### D. The Proposed Notices Provide Class Members With Sufficient Information About the Details of the Settlements.

The notice plan also provides potential members of the Settlement Classes with information about the benefits available under the Settlements, their options, and the service awards that may be requested at final approval.

Counsel for the TED Plaintiffs will seek reimbursement of certain of the litigation expenses already incurred during the course of the litigation of the cases involved in the Settlements. *See, e.g.*, Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorneys' fees and untaxable costs that are authorized by law or by the parties' agreement."); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008) ("Under the common fund doctrine, class counsel are entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses." (citation and internal quotation marks omitted)).

The notice plan will also advise members of the Settlement Classes that information about the Plans of Allocation of the proceeds of the Settlements will be published on the Settlement Website before the date that a decision about whether to participate in these Settlements must be made. TED Plaintiffs do not yet ask the Court to approve the Plans of Allocation and the Court may grant final approval before approving a plan of allocation. *See, e.g.*, MANUAL § 21.312 ("Often . . . the . . . details of allocation and distribution are not established until after the settlement is approved."); *In re Southeastern Milk Antitrust Litig.*, 2013

WL 2155379, at *3 (district court gave final approval to a settlement without a plan of allocation, noting that "[o]nce the claim processing procedure is completed, plaintiffs will submit a proposed plan of allocation of the settlement proceeds for the Court's approval"); *Packaged Ice*, 2011 WL 717519, at *2, 17 ("[c]lass Counsel explained at the Fairness Hearing that the final plan of allocation was not included in the original Notice in part because of the potential for additional settlements with other Defendants which may affect the final plan of allocation," and finally approving the settlements that were presented, retaining jurisdiction to, among other things, "enter[] any Orders or conducting any hearings in connection with any final plan of distribution or claims submission process . . . . "); *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987) ("To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished."); *In re Washington Public Power Supply System Sec. Litig.*, [1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶94,326, at 92,143, 1988 WL 158947 (W.D. Wash. July 28, 1988) ("Such deferral of allocation decisions is routinely followed in partial settlements where the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."). Information about how the settlement money will be allocated through the Plans of Allocation will be published and submitted before the final approval hearing.

Class representatives are "an essential ingredient of any class action" and incentive awards are appropriate to induce a business or consumer to participate in worthy class action lawsuits. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 2008). "Such "[i]ncentive awards serve an important function, particularly where the named plaintiffs participated actively in the

51

litigation." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006)

(citing *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 2005 WL 388562, at *31 (S.D.N.Y. Feb.

18, 2005)).

   The notice plan advises members of the Settlement Classes that interim service awards

will be requested for the dealerships that have served as class representatives in these cases.

These dealerships have already sustained a significant discovery burden and will continue to face

depositions and additional document discovery for a considerable period of time.  An award

from the Court recognizing the class representatives' efforts will be appropriate.  *See In re*

*Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *5 (E.D. Mich. Jan. 20, 2015)

(in a $19 million settlement, award of $50,000 to each class representative); *In re Skelaxin*

*Antitrust Litig.*, No. 12–cv–83, 2014 WL 2946459 (E.D. Tenn. June 30, 2014) (settlement of

direct purchaser pharmaceutical antitrust action, awarding $50,000 to each class representative);

*Connectivity Systems Inc. v. National City Bank*, 2011 WL 292008, at *20 (S.D. Ohio Jan. 26,

2011) (in $10 million settlement, awarding $50,000 each to three named plaintiffs); *Liberte*

*Capital Group v. Capwill*, 2007 WL 2492461, at *3 (N.D. Ohio Aug. 29, 2007) (awarding

$97,133.83 and $95,172.47 to two named plaintiffs representing subclasses that received $11

million and $7 million); *Hainey v. Parrott*, No. 1:02–cv–733, 2007 WL 3308027 (S.D. Ohio

Nov. 6, 2007) (approving service award of $50,000 for each class representative); *In re*

*Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535-36 (E.D. Mich.2003) (awarding $75,000 to

each class representative); *Brotherton v. Cleveland*, 141 F.Supp.2d 907, 913–14 (S.D. Ohio

2001) (granting a $50,000 service award out of a $5.25 million fund); *In re Revco Sec. Litig.*,

1992 WL 118800, *7 (N.D. Ohio May 6, 1992) ($200,000 incentive award to named plaintiff);

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 251 (S.D. Ohio

1991) (approving service awards of $50,000 to six class representatives out of a settlement fund of $56.6 million).

The notice plan also provides notice of counsel for the TED Plaintiffs' intent to request an interim award of attorneys' fees and expenses as part of the final approval process.  The Court may award attorneys' fees and expenses before the litigation is concluded. *See In re Air Cargo Shipping Serv. Litig.*, No. 06-md-1775 (JG) (VVP), 2011 WL 2909162, at *5-7 (E.D.N.Y. Jul. 15, 2011) (interim award granted); *In re Sterling Foster & Company, Inc. Sec. Litig.*, 238 F. Supp. 2d 480, 484-85, 489-90 (E.D.N.Y. 2002) (interim attorneys' fees awarded).  Counsel for the TED Plaintiffs have litigated these cases for three years and will continue to vigorously represent the interests of dealerships.  *See In re Diet Drugs Prod. Liab. Litig.*, 2002 WL 32154197, at *12 (E.D. Pa. Oct. 3, 2002) (awarding an interim fee after four years of litigation and noting "to make them wait any longer for at least some award would be grossly unfair").

## IV.    The Court Should Enter the Proposed Order, Which Schedules the Final Approval Hearing and Establishes Other Deadlines.

TED Plaintiffs respectfully request that the Court hold a single final approval hearing in connection with the Settlements.  At the hearing, the Court should consider whether the Settlements are fair, reasonable, and adequate; whether to approve a request for interim attorneys' fees and reimbursement of litigation expenses; and whether to approve a request for initial service awards for the named TED Plaintiffs.

The Proposed Order sets out the method and timing of requests for exclusion and for submitting any objections to the Settlements.  Other dates are also set out in the Proposed Order. The TED Plaintiffs propose the following schedule:

| Event | Time for Compliance |
|---|---|
| Mailing and E-mailing Mailing Notice, Establishment of Settlement Website | 30 days from Order allowing dissemination of notice |
| Commence Placement of Publication Notice | As soon as practicable from date of Order allowing dissemination of notice |
| Posting of information related to the Plans of Allocation on Settlement Website | October 20, 2016 |
| Filing of Motion in Support of Request for Attorneys' Fees, Reimbursement of Expenses, and Service Awards | October 20, 2016 |
| Deadline for filing Opt-Outs or objections to Settlements | October 28, 2016 |
| Deadline for appearance of counsel regarding objections | October 28, 2016 |
| Deadline for counsel to file notice of intent to appear at Final Approval Hearing | October 28, 2016 |
| Final Approval Hearing | November 17, 2016 at 9:30 a.m. |
| Proof of Claim deadline | March 31, 2017 |

## **CONCLUSION**

For the above reasons, TED Plaintiffs respectfully request that the motion for preliminary approval be granted and that the Court enter the accompanying Proposed Order:

1. Preliminarily approving the DENSO Settlement Agreement;

2. Preliminarily approving the LEONI Settlement Agreement;

3. Preliminarily approving the Tokai Rika Settlement Agreement;

4. Preliminarily approving the Furukawa Settlement Agreement;

5. Preliminarily approving the Autoliv Settlement Agreement;

6. Preliminarily approving the TRW Settlement Agreement;

7. Provisionally certifying the proposed VWHS Settlement Class;

8. Provisionally certifying the proposed OSS Settlement Class

9.  Staying the proceedings against the Settling Defendants in accordance with the terms of the respective Settlement Agreements;

10. Authorizing Settlement Class Counsel to provide notice of the respective Settlement Agreements to members of the respective Settlement Classes together with notice of the Settling Defendants' settlement in the form approved by the Court; and

11. Appointing Interim Lead Class Counsel as the TED Plaintiffs as Settlement Class Counsel for these settlements.


Dated: August 22, 2016

/s/ J. Manly Parks
Wayne A. Mack (PA Bar #46654)
J. Manly Parks (PA Bar #74647)
Andrew R. Sperl (PA Bar #311467)
William Shotzbarger (PA Bar #320490)
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
Phone: (215) 979-1000
Fax: (215) 979-1020
wamack@duanemorris.com
jmparks@duanemorris.com

*Counsel for Truck and Equipment Dealer Plaintiffs*

DM1\7152026.3

## CERTIFICATE OF SERVICE

I certify that today I served the Foregoing Truck and Equipment Dealer Plaintiffs'

Motion for Preliminary Approval of Proposed Settlement with Settling Defendants and

Provisional Certification of Settlement Classes with the Clerk of the Court using the ECF system

which will send notification of such filing to all of the ECF participants in this action.

Dated: August 22, 2016                           /s/ J. Manly Parks_____
                                                 J. Manly Parks